UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LASHEMA MARBLE, *et al.*,

      Plaintiffs,

v.

GOVERNOR RICK SNYDER, *et al.*,

      Defendants.

No. 5:17-cv-12942-JEL-MKM

HON. JUDITH E. LEVY

MAG. MONA K. MAJZOUB

---

## STATE DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND (b)(6)

State Defendants (Governor Snyder, former Treasurer Andy Dillon, Director Nick Lyon and Dr. Eden Wells) respectfully move, under Federal Rules of Civil Procedure 12(b)(1) and (b)(6), to dismiss all the claims asserted against them in the amended complaint filed in *Marble v. Snyder,* Case No. 17-12492.  In support, State Defendants state:

1.    This Court lacks subject-matter jurisdiction over Plaintiffs' claims against Governor Snyder in his official capacity.  Those claims do not avoid the Eleventh Amendment's jurisdictional bar because they do

not allege an ongoing violation of federal law and the relief sought is
remedial—not prospective.

2.    Plaintiffs fail to state a claim in avoidance of the immunity
accorded Governor Snyder, former Treasurer Dillon, Director Lyon, and
Dr. Wells under federal and state law.

 a.    Governor Snyder, former Treasurer Dillon, Director
Lyon, and Dr. Wells are entitled to qualified immunity on the 42
U.S.C. §§ 1983 and 1985(3) claims because Plaintiffs have not
adequately alleged that any of these Defendants violated a clearly
established constitutional right.

 b.    Michigan law accords absolute immunity to Governor
Snyder, former Treasurer Dillon, Director Lyon, and Dr. Wells
against Plaintiffs' state-tort-law claims.

3.    Plaintiffs fail to state a claim upon which relief can be
granted under federal law.

 a.    Plaintiffs' claims do not meet the plausibility pleading
requirements because Plaintiffs do not definitively allege that the
death of Bertie Marble—the basis of all their claims—was caused
by legionella.

b.     Plaintiffs fail to state a claim for a violation of substantive due process because they have not pled the necessary elements of state-created danger, nor is there liability under their theory of a bodily integrity violation.

c.     Plaintiffs fail to state a claim under the Equal Protection Clause because they belong to the comparator group and not the group allegedly discriminated against, their comparator group is not similarly situated, they have not shown discriminatory intent, and the rational basis test is met.

d.     Plaintiffs fail to state a claim for conspiracy under 42 U.S.C. § 1985(3) because they do not allege invidious discrimination based on either their membership in a protected class or on their assertion of a fundamental right.

e.     Plaintiffs fail to state a due process, access-to-courts claim because they do not adequately plead a lost cause of action, do not allege an unsuccessful attempt to bring their claims in state court, do not identify the relief that cannot be obtained by their remaining claims, and do not identify any wrongful conduct by State Defendants.

4.     Plaintiffs fail to state a claim upon which relief can be granted under state law.

a.     Plaintiffs' Elliott-Larsen Civil Rights Act claim fails because they have not established intentional discrimination or disparate treatment.

b.     Plaintiffs have not stated a claim for gross negligence because it is not an independent cause of action under Michigan law.

c.     Plaintiffs' intentional-infliction-of-emotional-distress claim fails because State Defendants' alleged conduct does not support this claim.

d.     The claim for punitive damages fails because it is not an independent cause of action, and Plaintiffs have failed to plead statutory authorization for punitive damages.

Pursuant to E.D. Mich. LR 7.1(a), State Defendants' counsel and Plaintiffs' counsel held a conference on May 29, 2018, in which State Defendants' counsel explained the nature of the motion and its legal basis, and requested, but did not obtain, concurrence in dismissal of any claims.

State Defendants request this Court grant their motion to dismiss for the reasons set forth above and more fully in the accompanying brief and enter its judgment for them on all counts.

Respectfully submitted,

/s/ Zachary C. Larsen

| | |
|---|---|
| Eugene Driker (P12959) | Richard S. Kuhl (P42042) |
| Morley Witus (P30895) | Margaret A. Bettenhausen (P75046) |
| Todd R. Mendel (P55447) | Nathan A. Gambill (P75506) |
| Special Assistant Attorneys | Zachary Larsen (P72189) |
| General for Governor Richard | Assistant Attorneys General |
| D. Snyder | Environment, Natural Resources, |
| Barris, Sott, Denn & Driker, | and Agriculture Division |
| PLLC | Attorneys for State Defendants |
| 333 W. Fort Street, Suite 1200 | P.O. Box 30755 |
| Detroit, MI 48226 | Lansing, MI 48909 |
| (313) 965-9725 | (517) 373-7540 |
| edriker@bsdd.com | kuhlr@michigan.gov |
| mwitus@bsdd.com | bettenhausenm@michigan.gov |
| tmendel@bsdd.com | gambilln@michigan.gov |
| | larsenz@michigan.gov |

Dated:  May 30, 2018

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LASHEMA MARBLE, *et al.*,
    Plaintiffs,

v.

GOVERNOR RICK SNYDER, *et al.*,
    Defendants.

HON. JUDITH E. LEVY

MAG. MONA K. MAJZOUB

No. 5:17-cv-12942-JEL-MKM

_____

**BRIEF IN SUPPORT OF STATE DEFENDANTS'
MOTION TO DISMISS PURSUANT TO FEDERAL
RULES OF CIVIL PROCEDURE 12(b)(1) AND (b)(6)**

Eugene Driker (P12959)
Morley Witus (P30895)
Todd R. Mendel (P55447)
Special Assistant Attorneys
General for Governor Richard
D. Snyder
Barris, Sott, Denn & Driker,
PLLC
333 W. Fort Street, Suite 1200
Detroit, MI 48226
(313) 965-9725
edriker@bsdd.com
mwitus@bsdd.com
tmendel@bsdd.com

Dated: May 30, 2018

Richard S. Kuhl (P42042)
Margaret A. Bettenhausen (P75046)
Nathan A. Gambill (P75506)
Zachary Larsen (P72189)
Assistant Attorneys General
Environment, Natural Resources,
and Agriculture Division
Attorneys for State Defendants
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540
kuhlr@michigan.gov
bettenhausenm@michigan.gov
gambilln@michigan.gov
larsenz@michigan.gov

# TABLE OF CONTENTS

<u>Page</u>

Index of Authorities.................................................................iv

Concise Statement of Issues Presented ...................................xiii

Controlling or Most Appropriate Authority...........................xvi

Introduction ..........................................................................1

Facts and Background.............................................................2

    The City of Flint switches water sources.........................3

    The State had a limited role in the treatment of the Flint
        River water.......................................................6

    Outbreak of Legionnaires' disease in Genesee County. ...............11

    The State's response to Flint water concerns................14

Argument................................................................................17

I.    Plaintiffs' official capacity claims against Governor Snyder
    are barred by the Eleventh Amendment. ......................17

    A.    The Eleventh Amendment bars jurisdiction over the
        federal- and state-law claims against Governor Snyder
        in his official capacity............................................17

    B.    The *Ex parte Young* exception does not apply because
        there is no ongoing violation of federal law and the
        relief sought is not prospective. ............................18

II.    Plaintiffs fail to state a claim in avoidance of the immunity
    accorded State Defendants under federal and state law. ............22

    A.    Governor Snyder, former Treasurer Dillon, Director
        Lyon and Dr. Wells are entitled to qualified immunity.......23

i

1.   Plaintiffs fail to show a constitutional right violation. .................................................................. 24

2.   The right was not "clearly established." ...................... 25

B.   State Defendants are entitled to state-law immunity. ........ 33

III.   Plaintiffs fail to state a claim upon which relief can be granted under federal law. ........................................................... 35

A.   Plaintiffs fail to meet pleading standards. ........................ 36

B.   Plaintiffs fail to allege the elements of a state-created danger claim. ........................................................................ 38

C.   Plaintiffs fail to allege a violation of a recognized bodily integrity right. .................................................................... 40

D.   Plaintiffs fail to state an equal-protection claim. ............... 46

1.   As a threshold matter, Plaintiffs belong to the comparator group and not the group allegedly discriminated against. .................................................. 48

2.   The "similarly situated" requirement has not been met. ........................................................................ 48

3.   No fundamental right is involved. ............................... 51

4.   There is no race-based discrimination. ........................ 51

5.   There is no wealth-based discrimination. .................... 56

E.   There is no *respondeat superior* liability under § 1983. ........ 57

F.   Plaintiffs fail to state a claim for conspiracy under 42 U.S.C. § 1985(3). ............................................................... 59

G.   Plaintiffs fail to state a denial of access-to-courts claim. ...... 60

IV.   Plaintiffs fail to state a claim under state law. ............................. 65

A.   Plaintiffs fail to state a claim for violation of ELCRA because neither intentional discrimination nor disparate treatment have been established. ........................66

B.   Plaintiffs have not stated a claim for gross negligence because it is not an independent cause of action under Michigan law. ...........................................................................68

C.   Plaintiffs' intentional-infliction-of-emotional-distress claim fails because no conduct by State Defendants, as alleged, supports this claim. .................................................68

D.   "Punitive damages" is not an independent cause of action, and Plaintiffs have failed to plead statutory authorization for punitive damages. ...................................69

Conclusion and Relief Requested.............................................................70

Certificate of Service ................................................................................71

# INDEX OF AUTHORITIES

Page

**Cases**

*Agent Orange Prod. Liab. Litig.,*
  475 F. Supp. 928 (E.D. N.Y. 1979) ....................................................... 42

*American Transm. v. Attorney Gen.,*
  560 N.W.2d 50 (Mich. 1997) ................................................................. 34

*Anderson v. Creighton,*
  483 U.S. 635 (1987) ...................................................................... 25, 26

*Arrington-Bey v. City of Bedford Heights,*
  858 F.3d 988 (6th Cir. 2017) .................................................................. 27

*Ashcroft v. al-Kidd,*
  563 U.S. 731 (2011) ...................................................................... 23, 26

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................... 36, 65

*Bartell v. Lohiser,*
  215 F.3d 550 (6th Cir. 2000) .................................................................. 59

*Boler v. Earley,*
  865 F.3d 391 (6th Cir. 2017) ...................................................... 17, 18, 20

*Bounds v. Smith,*
  430 U.S. 817 (1977) ............................................................................ 61

*Braley v. City of Pontiac,*
  906 F.3d 220 (6th Cir. 1990) .................................................................. 42

*Browder v. Tipton,*
  630 F.2d 1149 (6th Cir. 1980) ................................................................ 59

*Buckner v. Roy,*
  No. 15-10441, 2015 U.S. Dist. LEXIS 108371
  (E.D. Mich. Aug. 18, 2015) .................................................................... 68

iv

*Callihan v. Sudimack,*
  117 F.3d 1420, 1997 U.S. App. LEXIS 17731 (6th Cir. 1997) ............ 42

*Cartwright v. Marine City,*
   336 F.3d 487 (6th Cir. 2003) ............................................................ 23

*Casey v. Auto Owners Ins. Co.,*
  729 N.W.2d 277 (Mich. Ct. App. 2006) ........................................... 69

*Choate's Air Conditioning & Heating, Inc. v. Light, Gas & Water*
  *Div. of the City of Memphis,*
  16 F. App'x. 323 (6th Cir. 2001) ...................................................... 43

*Christopher v. Harbury,*
  536 U.S. 403 (2002) ............................................................ 62, 63, 64

*City of Cleburne, Tex v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) .......................................................................... 55

*Clarke v. K Mart Corp.,*
  495 N.W.2d 820 (Mich. Ct. App. 1992) ........................................... 66

*Collins v. City of Harker Heights,*
  503 U.S. 115 (1992) .................................................................... 41, 45

*Concerned Pastors for Social Action v. Khouri,*
  No. 16-10277 (E.D. Mich. April 4, 2017) ......................................... 15

*Coshow v. City of Escondido,*
  34 Cal. Rptr. 3d 19 (Cal. App. 4th 2005) .................................... 41, 42

*Ctr. for Bio-Ethical Reform, Inc. v. Napolitano,*
  648 F.3d 365 (6th Cir. 2011) ............................................................ 49

*Dept. of Health and Human Svs. v. Genesee Circuit Judge,*
  318 Mich. App. 395 (2016) ............................................................... 14

*DeShaney v. Winnebago Cty. Dept. of Soc. Servs.,*
  489 U.S. 189 (1989) .................................................................... 41, 43

*Doe v. Mich. Dept. of State Police,*
  490 F.3d 491 (6th Cir. 2007) ...................................................... 47, 55

*Does v. Munoz,*
  507 F.3d 961 (6th Cir. 2007) .............................................................. 47

*Edelman v. Jordan,*
  415 U.S. 651 (1974) ........................................................................... 21

*Ely v. Velde,*
  451 F.2d 1130 (4th Cir. 1971) ........................................................... 42

*Evans v. Plummer,*
  687 F. App'x. 434 (6th Cir. 2017) ..................................................... 27

*Ewolski v. City of Brunswick,*
  287 F.3d 492 (6th Cir. 2002) ............................................................ 46

*Farmer v. Brennan,*
  511 U.S. 826 (1994) ........................................................................... 46

*FCC v. Beach Commc'ns, Inc.,*
  508 U.S. 307 (1993) ..................................................................... 47, 55

*Flagg v. City of Detroit,*
  715 F.3d 165 (6th Cir. 2013) ......................................................... 61, 64

*Fonseca v. Michigan State Univ.,*
  542 N.W.2d 273 (Mich. Ct. App. 1995) ............................................. 67

*Genesee Cty. Drain Comm'r v. Genesee Cty.,*
  869 N.W.2d 635 (Mich. Ct. App. 2015) ............................................. 35

*Green v. Mansour,*
  474 U.S. 64 (1985) ............................................................................. 22

*Griffin v. Breckenridge,*
  403 U.S. 88 (1971) ............................................................................. 59

*Guertin v. Michigan,*
  No. 16-12412 (E.D. Mich. June 5, 2017),
  *appeal docketed* No. 17-1698 (6th Cir. June 20, 2017) ................ passim

*Harris v. Univ. of Mich. Bd. of Regents,*
  219 N.W.2d 679 (Mich. Ct. App. 1996) ............................................. 34

*Haynes v. Neshewat,*
   729 N.W.2d 488 (Mich. 2007) ............................................................. 66

*Hays v. Jefferson Cty., Ky.,*
   668 F.2d 869 (6th Cir. 1982) ................................................... 28, 57, 58

*Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.,*
   542 F.3d 529 (6th Cir. 2008) ........................................................ 45, 46

*Jones v. Reynolds,*
   438 F.3d 685 (6th Cir. 2006) ........................................................ 38, 39

*Kincaid v. City of Flint,*
   874 N.W.2d 193 (Mich. Ct. App. 2015) ............................................... 25

*Lombardi v. Whitman,*
   485 F.3d 73 (2d Cir. 2007) ............................................................ 44, 45

*Malley v. Briggs,*
   475 U.S. 335 (1986) ............................................................................ 23

*Mansfield Apartment Owners Ass'n. v. City of Mansfield,*
   998 F.2d 1469 (6th Cir. 1993) ............................................................ 42

*Martinez v. Cui,*
   608 F.3d 54 (1st Cir. 2010) ................................................................. 40

*Milliken v. Bradley,*
   433 U.S. 267 (1977) ............................................................................ 20

*Moore v. Detroit Sch. Reform Bd.,*
   293 F.3d 352 (6th Cir. 2002) ........................................................ 52, 53

*Papasan v. Allain,*
   478 U.S. 265 (1986) ............................................................................ 22

*Paul v. Davis,*
   424 U.S. 693 (1976) ............................................................................ 40

*Pennhurst State School & Hosp. v. Halderman,*
   465 U.S. 89 (1984) .............................................................................. 18

*Perry v. McGinnis,*
   209 F.3d 597 (6th Cir. 2000) ............................................................. 49

*Petipren v. Jaskowski,*
   833 N.W.2d 247 (Mich. 2013) ........................................................... 34

*Phillips v. Snyder,*
   836 F.3d 707 (6th Cir. 2016) ....................................................... 56, 57

*Pinkney v. Ohio Envtl. Prot. Ag.,*
   375 F. Supp. 305 (N.D. Ohio 1974) .................................................. 42

*Powers v. Hamilton County Pub. Defender Comm'n,*
   501 F.3d 592 (6th Cir. 2007) ............................................................. 37

*Radvansky v. City of Olmsted Falls,*
   395 F.3d 291 (6th Cir. 2005) ............................................................. 47

*Range v. Douglas,*
   763 F.3d 573 (6th Cir. 2014) ............................................................. 44

*Reisman v. Regents of Wayne State Univ.,*
   470 N.W.2d 678 (Mich. Ct. App. 1991) ......................................... 66, 67

*Roberts v. Auto Owners Ins. Co.,*
   374 N.W.2d 905 (Mich. 1985) ........................................................... 68

*Sailors v. Bd. of Ed., Kent Cty.,*
   387 U.S. 105 (1967) .......................................................................... 25

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
   411 U.S. 1 (1973) .............................................................................. 47

*Saucier v. Katz,*
   533 U.S. 194 (2001) .......................................................................... 26

*Scott v. Kent Cty.,*
   679 F. App'x. 435 (6th Cir. 2017) ..................................................... 27

*Shehee v. Luttrell,*
   199 F.3d 295 (6th Cir. 1999) ....................................................... 29, 58

*Sperle v. Mich. Dept. of Corrections*,
  297 F.3d 483 (2002) ............................................................ 46

*Stiles v. Grainger Cty.*,
  819 F.3d 834 (6th Cir. 2016) ............................................ 38

*Swekel v. City of River Rouge*,
  119 F.3d 1259 (6th Cir. 1997) ...................................... 61, 63

*Tanner v. Armco Steel Corp.*,
  340 F. Supp. 532 (S.D. Tex. 1972)...................................... 42

*Terrance v. Northville Regional Psychiatric Hosp.*,
  286 F.3d 834 (6th Cir. 2002) .............................................. 24

*TriHealth, Inc. v. Bd. of Comm'rs*,
  430 F.3d 783 (6th Cir. 2005) .............................................. 49

*Turner v. Safley*,
  482 U.S. 78 (1987) ............................................................ 61

*Vacco v. Quill*,
  521 U.S. 793 (1997) .......................................................... 49

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
  535 U.S. 635 (2002) .......................................................... 18

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*,
  429 U.S. 252 (1977) ................................................ 52, 53, 54

*White v. Pauly*,
  137 S. Ct. 448 (2017) .................................................. 26, 27

*Will v. Mich. Dept. of State Police*,
  491 U.S. 58 (1989) ............................................................ 18

*Wilson v. Layne*,
  526 U.S. 603 (1999) .......................................................... 26

## Statutes

1976 P.A. 399 ................................................................................ 6

2012 P.A. 436 ....................................................................... passim

28 U.S.C. § 1367(c)(3) ................................................................ 65

42 U.S.C. § 1985(3) ..................................................................... 59

42 U.S.C. § 300g-1(b) ................................................................... 6

42 U.S.C. § 300g-2 ........................................................................ 6

Mich. Comp. Laws § 141.1444 .............................................. 50, 57

Mich. Comp. Laws § 141.1543(a) ............................................... 56

Mich. Comp. Laws § 141.1543(b) ............................................... 56

Mich. Comp. Laws § 141.1549(2) .......................................... 25, 51

Mich. Comp. Laws § 141.1552(1)(dd) ........................................ 25

Mich. Comp. Laws § 141.1552(3) ................................................. 4

Mich. Comp. Laws § 141.1552(3) .......................................... 31, 32

Mich. Comp. Laws § 1444(2) ...................................................... 50

Mich. Comp. Laws § 1445 ..................................................... 50, 57

Mich. Comp. Laws § 325.1007(1) ................................................. 6

Mich. Comp. Laws § 37.2302(a) .................................................. 66

Mich. Comp. Laws § 691.1401(b) ............................................... 34

Mich. Comp. Laws § 691.1407(1) .......................................... 33, 34

Mich. Comp. Laws §§ 1445(3)(a) ............................................... 50

Mich. Comp. Laws §§ 1445(3)(b) ............................................................ 50

Mich. Comp. Laws §§ 1445(3)(c) ............................................................ 50

Mich. Comp. Laws §§ 1445(3)(d) ............................................................ 50

Mich. Comp. Laws §§ 1445(3)(e) ............................................................ 50

Mich. Comp. Laws §§ 1445(3)(f) ............................................................ 50

Mich. Comp. Laws §§ 1445(3)(g) ............................................................ 50

Mich. Comp. Laws §§ 1445(3)(h) ............................................................ 50

Mich. Comp. Laws §§ 1445(3)(i) ............................................................ 50

Mich. Comp. Laws §§ 1445(3)(j) ............................................................ 50

Mich. Comp. Laws §§ 1445(3)(k) ............................................................ 50

Mich. Comp. Laws §§ 1445(3)(l) ............................................................ 50

Mich. Comp. Laws §§ 1445(3)(m) ............................................................ 50

**Rules and Regulations**

21 C.F.R. § 165.110(b)(4)(iii)(A) ............................................................ 16

40 C.F.R. § 141.70(a) ............................................................ 21

40 C.F.R. § 141.80 ............................................................ 6

40 C.F.R. § 141.81 ............................................................ 6

40 C.F.R. § 141.81(b) ............................................................ 7

40 C.F.R. § 141.81(d) ............................................................ 7, 12

Fed. R. Civ. P. 12(b)(1) ............................................................ 70

Fed. R. Civ. P. 12(b)(6) ............................................................ 70

Fed. R. Civ. P. 8(a)(2) ............................................................ 36

Mich. Admin. Code r. 325.10410 ...............................................................6

Mich. Admin. Code r. 325.10604f ..............................................................6

Mich. Admin. Code r. 325.10604f(2)(b) .....................................................7

Mich. Admin. Code r. 325.10604f(2)(d) ............................................ passim

Mich. Admin. Code r. 325.10604f(d) ..........................................................6

Mich. Admin. Code r. 325.10710a ..............................................................6

Mich. Admin. Code r. 325.10710b ..............................................................6

Mich. Admin. Code r. 325.10710c ..............................................................6

Mich. Admin. Code r. 325.10710d ..............................................................6

## CONCISE STATEMENT OF ISSUES PRESENTED

1.   State agencies and officials have immunity under the Eleventh Amendment, absent waiver or congressional abrogation that do not apply here.  This immunity applies equally to state-law claims.  It bars Plaintiffs' injunctive relief claims against Governor Snyder in his official capacity because the claims seek retrospective relief unavailable under *Ex parte Young.*

2.   State officials are entitled to qualified immunity on §§ 1983 and 1985(3) claims unless the plaintiffs allege a violation of a constitutional right so clearly established that the constitutional question is "beyond debate."  Here, Governor Snyder, former Treasurer Dillon, Director Lyon, and Dr. Wells are entitled to qualified immunity because Plaintiffs have not alleged the violation of a clearly established constitutional right.

3.   Michigan law accords its elective and highest appointive officials absolute immunity from liability on state-law tort claims.  State Defendants are entitled to absolute immunity from state tort liability here.

4.   A state-created danger exists where:  defendants created or increased the risk of harm to plaintiff by a third party; plaintiffs were placed in special danger different from that of the general public; and the defendants knew plaintiffs were placed at specific risk.  Here, Plaintiffs fail to plead these requisite elements and their substantive-due-process, state-created danger claim fails as a matter of law.

5.   Under well-established case law, to support a substantive-due-process bodily integrity claim, plaintiffs must show that state officials acted with a harmful purpose or deliberate indifference.  In addition, courts have recognized only a limited number of bodily integrity rights.  Plaintiffs have failed to show that State Defendants acted with the requisite

harmful purpose or deliberate indifference, and no court has recognized the rights Plaintiffs advance. Plaintiffs' substantive-due-process, bodily integrity claim fails as a matter of law.

6.  A claim for violation of the Equal Protection Clause based on race or wealth must involve a comparison to a similarly situated group, which is lacking here. Plaintiffs must also demonstrate a discriminatory purpose, which is also lacking. Because the rational basis test is met, the equal-protection claims must be dismissed.

7.  A conspiracy claim under 42 U.S.C. § 1985(3) requires either animus against a protected group or a fundamental right, neither of which is involved here. The conspiracy claim fails.

8.  A backward-looking denial-of-access-to-court claim requires a plaintiff to (1) identify in the pleadings a non-frivolous cause of action lost by the alleged wrongful conduct; (2) attempt to access state courts before filing; (3) demonstrate how the relief they could have obtained differs from the relief currently available; and (4) identify wrongful conduct obstructing access to state courts on an individualized basis. Plaintiffs have not met any of these elements in their claims against State Defendants.

9.  A claim under Michigan's Elliott-Larsen Civil Rights Act (ELCRA) requires discriminatory intent or disparate treatment, neither of which Plaintiffs establish here. This claim should be dismissed.

10. Michigan does not recognize an independent claim for gross negligence, so the gross negligence claim must be dismissed.

11. Plaintiffs fail to allege conduct supporting the intentional-infliction-of-emotional-distress claim, warranting dismissal.

12.   There is no independent cause of action for punitive
        damages.  And they can be awarded only if statutorily
        authorized.  Plaintiffs have not plead a statutory basis for
        punitive damages; thus, this claim should be dismissed.

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

<u>*Authority*</u>:

*Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988 (6th Cir. 2017)

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)

*Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017)

*Braley v. City of Pontiac,* 906 F.3d 220 (6th Cir. 1990)

*Christopher v. Harbury*, 536 U.S. 403 (2002)

*Coshow v. City of Escondido*, 34 Cal. Rptr. 3d 19 (Cal. App. 4th 2005)

*DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189 (1989)

*Guertin v. Michigan,* No. 16-12412, Dkt. 151 (E.D. Mich. June 5, 2017)

*Hays v. Jefferson Cty., Ky.*, 668 F.2d 869 (6th Cir. 1982)

*Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.,* 542 F.3d 529 (6th Cir. 2008)

*Jones v. Reynolds*, 438 F.3d 685 (6th Cir. 2006)

*Range v. Douglas*, 763 F.3d 573 (6th Cir. 2014)

*TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783 (6th Cir. 2005)

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977)

*White v. Pauly*, 137 S. Ct. 448 (2017)

## INTRODUCTION

This is a Flint water action concerning legionella.  But data from the 2014–2015 outbreak of Legionnaires' disease in Genesee County shows little, if any, relationship to the Flint water system.  Instead, it shows an overwhelming connection to McLaren Flint Hospital (McLaren).  Indeed, although the majority of persons contracting Legionnaires' did not reside on Flint water, the majority of such cases (and 10 of 12 Legionnaires' deaths) occurred in persons with exposure at McLaren.  And while McLaren failed to collect—and even obstructed the Michigan Department of Health and Human Services (MDHHS) from obtaining—information regarding the outbreak, the State later learned that McLaren's own consultant informed the hospital that legionella issues were not due to the water system but were likely internal to the hospital.

Not surprisingly, Plaintiff Bertie Marble was a patient at McLaren.  (Dkt. 48, Pg. ID #264, ¶9.)  And although Plaintiffs allege legionella-based claims deriving from Ms. Marble's death, they simultaneously note "uncertainty" as to whether legionella actually caused her death.  That certainty alone fails to meet plausibility

pleading standards.  But there are additional problems, as well:  those claims are jurisdictionally barred, precluded by state and federal immunity, and otherwise legally deficient.  For those reasons, this Court should dismiss Plaintiffs' claims against State Defendants.

Such a dismissal would not signal an end to the State's involvement and commitment to solving the issues surrounding Flint water in a satisfactory way for all concerned.  It would signal only that this lawsuit is the wrong vehicle to resolve these issues and that Plaintiffs' pursue the wrong parties to answer for the alleged harm.

## FACTS AND BACKGROUND

Although this is exclusively a legionella action, the amended complaint is a short-form complaint that incorporates the individual master complaint adopted in *Walters v. City of Flint*, Case No. 17-10164 (Plaintiffs' Master Long Form Complaint and Jury Demand [Master Compl.], Dkt. 115, Pg.ID #1394, ¶76).  Because that document alleges that legionellosis infections arose from the City of Flint's water switch, those allegations are addressed below.

2

**The City of Flint switches water sources.**

On March 29, 2013, after receiving water from the Detroit Water and Sewerage Department (DWSD) for nearly 50 years, Flint decided to join a new water supplier, the Karegnondi Water Authority (KWA). (Ex. 1, March 2016 Flint Water Advisory Task Force Final Report, App. V, at 4.)  Shortly thereafter, the DWSD notified Flint that its contract would terminate in one year.  (*Id.*)  Because the KWA would not be operational by then, Flint had to decide where to source its water.

Using the Flint River as a primary water source had been considered for some time.  In 2011, Flint commissioned a study that compared the cost of treating Flint River water as an alternative to purchasing water from the DWSD or KWA.  (Ex. 2, 2011 LAN Report.) Contrary to Plaintiffs' assertion (No. 17-10164, Plaintiffs' Master Long Form Complaint and Jury Demand (Master Compl.), Dkt. 115, Pg.ID #1394, ¶76), the Flint River was not rejected as a water source in 2011. Instead, the 2011 report confirmed that Flint River water could be adequately treated, but the cost of upgrading the water treatment plant's infrastructure to accommodate long-term demand would still exceed the cost of joining the KWA.  (Ex. 2, at 7.)  It also confirmed that

3

Flint River water could be safely and properly treated at Flint's water treatment plant.  (*Id.*)

Knowing that the KWA would not be completed before its contract with DWSD terminated, Flint opted on June 26, 2013 to temporarily take its water from the Flint River.  (Ex. 3, June 26, 2013 Flint Resolution.)  Flint also hired Lockwood, Andrews & Newnam, Inc. (LAN) to place Flint's water plant into operation.  (*Id.*)

Flint was not the only DWSD customer to join the KWA.  Genesee County also decided to end its relationship with DWSD and join the KWA.  Jurisdictionally separate from the City, the Genesee County Drain Commissioner operates the county's water system and has authority to choose its water supply.  (Ex. 4, November 10, 1966 Genesee County Resolution.)  Unlike the City, Genesee County decided to purchase treated water from DWSD during KWA's construction.

Because joining the KWA would require entering into a contract exceeding $50,000 without a competitive bidding process, the City and the emergency manager sent the proposal to the Treasurer for review. Mich. Comp. Laws § 141.1552(3).  The Treasurer hired an engineering firm to evaluate whether joining the KWA would provide the City with

4

the anticipated long-term cost savings.  (No. 17-10164, Master Compl.,

Dkt. 115, Pg.ID #1395, ¶80.)  The firm ultimately concluded that joining

the KWA would save money over the long-term when compared to the

option of the City continuing to obtain 100% of its water from DWSD

rather than a blending option.  (Ex. 5, TYJT February 2013 Report, at

18, Figure 6-1.)  Shortly after this conclusion, DWSD presented an offer

that the firm had not considered:  constructing a parallel pipeline from

DWSD.  Based on this proposal, the firm recommended to the Treasurer

that the City stay with DWSD.  (No. 17-10164, Master Compl., Dkt.

115-2, Pg.ID #1597.)

Meanwhile, Flint's City Council voted 7–1 in favor of joining

KWA.  (Ex. 1, App. V, at 4.)  Three days later, on March 28, 2013, the

Treasurer attended a presentation with the Michigan Department of

Environmental Quality (MDEQ), KWA, the City, and the engineering

firm, and as a result, recommended supporting "the City of Flint's

decision to join KWA" noting that "[t]he City's Emergency Manager,

Mayor, and City Council all support this decision."  (No. 17-10164,

Master Compl., Dkt. 115, Pg. ID #1396, fn. 2.)

**The State had a limited role in the treatment of the Flint River water.**

The Safe Drinking Water Act (SDWA) sets national standards that must be met by drinking water suppliers. 42 U.S.C. § 300g-1(b). States may obtain primary enforcement responsibility (primacy) by adopting regulations that are no less stringent than the federal standards. 42 U.S.C. § 300g-2. Michigan gained primacy by enacting the Michigan Safe Drinking Water Act, 1976 P.A. 399.

As the owner of the public water supply, Flint is responsible under the SDWA for knowing and following all Act 399's requirements, such as ensuring proper design, construction, operations, and maintenance, so that contaminants in tap water do not exceed the SDWA standards. *See e.g.*, Mich. Comp. Laws § 325.1007(1). One such standard is the "Lead and Copper Rule" (LCR). *See* 40 C.F.R. § 141.80, *et seq.*; Mich. Admin. Code r. 325.10410, 325.10710a–10710d, and 325.10604f. The LCR's purpose is to protect public health by minimizing lead and copper levels in drinking water through optimizing corrosion control. 40 C.F.R. § 141.81; Mich. Admin. Code r. 325.10604f(d). Once a supply has "optimized," it is required to "continue to operate and maintain optimal

corrosion control treatment . . . ˮ  40 C.F.R. § 141.81(b); Mich. Admin.

Code r. 325.10604f(2)(b).

DWSD had optimized corrosion control treatment in the 1990s.

But because the Flint River was a *new* supply with its own distinct

chemical characteristics, MDEQ believed Flint could not be required to

"maintain" the previous corrosion control treatment.  Instead, *consistent*

*with the standard imposed on every other large water system in the State*

*under the SDWA*, MDEQ required Flint to conduct "initial monitoring"

over two, six-month periods to determine if treatment was required, and

if so, to provide information to determine the required treatment.  40

C.F.R. § 141.81(d); Mich. Admin. Code r. 325.10604f(2)(d).  The U.S.

Environmental Protection Agency (EPA) later concluded on

November 3, 2015, that this interpretation was one possible

interpretation of the rule.  (Ex. 6, November 3, 2015 EPA memorandum

regarding LCR requirements for optimal corrosion control.)

Shortly after the City switched to the Flint River, the City began

conducting the required two, six-month rounds of initial sampling to

determine lead levels in the water.  The City collected the samples,

certified that the samples complied with SDWA parameters, and submitted the samples to MDEQ. (Ex. 1, App. V, at 7.)

Although the water leaving the plant met SDWA criteria, Flint's distribution system was aging and experienced many water main breaks. As a result, Flint residents complained of various water issues, including poor taste and smell. (*Id*.) In September 2014, MDEQ found that the City's samples had exceeded limits for Total Trihalomethane and requested that the City complete a comprehensive operational evaluation, which the City hired LAN to complete. (*Id*., at 8.)

On December 31, 2014, based on the City's certified samples, the first six-month lead monitoring period showed that the lead levels were at 6 parts per billion (ppb), well below the 15 ppb action level. The City then began its second six-month lead monitoring period. (*Id*.) To assist with ongoing efforts to improve water quality, the Governor awarded the City $2 million, and, on February 10, 2015, the City retained the engineering firm Veolia to evaluate its water system. (*Id*. at 9.)

LAN's 2015 report recommended that the City significantly increase the amount of ferric chloride added to Flint's water. (No. 17-10164, Master Compl., Dkt. 115, ¶247.) The next month, Veolia issued

8

a report that also recommended Flint significantly increase the amount of ferric chloride, which had the effect of making the water much more acidic and corrosive.  (*Id.* at ¶245.)

In January 2015, Flint resident LeeAnn Walters raised with the EPA concerns regarding the quality of the water in her home.  (*Id.*)  In May, the City replaced an unusually long lead service line at Ms. Walters' home, and her water quality improved.  (*Id.*, App. V, at 12.)   In June, an EPA employee who had previously visited Ms. Walters' home provided her with a copy of a draft report he had submitted to his supervisor that raised concerns about the widespread problems with lead in Flint's water system.  (*Id.*, App. V, at 12.)  Approximately one week later, EPA officials assured the City and MDEQ that "it would be premature to draw any conclusions" from the draft report in part because the City's second six-month monitoring period was not yet complete.  (*Id.*)

Notwithstanding the preliminary nature of the report, media outlets reported that lead was a serious concern in all of Flint's water. (*Id.*)  This prompted repeated responses from MDEQ officials that,

based on the most recent City-wide testing, lead was actually not a significant concern in Flint.  (*Id*. at 14.)

On July 31, 2015, the City completed its second six-month round of lead monitoring.  The samples showed that the City's lead levels were at 11 ppb, still below the 15 ppb action level.  But because lead levels had risen, on August 17, 2015, MDEQ directed the City to implement corrosion-control treatment measures immediately.  (*Id*.)

Thereafter, Virginia Polytechnic Institute and State University notified the City and MDEQ that it would start collecting water samples in the City on August 23, 2015.  (*Id*. at 15.)  By August 27, 2015, Virginia Tech found that many samples had elevated lead levels. (*Id*.)  Media outlets widely reported Virginia Tech's conclusions that lead was a serious problem in Flint, again prompting MDEQ officials to rely on the City's certified results showing that lead levels City-wide were actually below the federal action level.  (*Id*. at 16.)  And while a subsequent analysis of blood lead levels has concluded that there was no "environmental emergency" nor were any children exposed at levels requiring medical treatment, (Ex. 7, Gomez, *Journal of Pediatrics*, "Blood Lead Levels of Children of Flint, Michigan:  2006-2016"),

Edwards' analysis and Dr. Hanna-Attisha's analysis of blood lead levels at the time raised concerns leading to the declaration of emergency. (See also, Ex. 8, Hurley Medical Center Announcement Re: BLLs and Lead Poisoning.)

**Outbreak of Legionnaires' disease in Genesee County.**

During the summers of 2014 and 2015, Genesee County experienced a spike in legionellosis infections—commonly referred to as Legionnaires' disease. Whereas state epidemiological data projected an expected incidence of roughly 26 cases of Legionnaires' during those years, the County instead had 90 cases. (Ex. 9, MDHHS Legionella Presentation, at 45.) Consistent with prior years, most of those cases involved county residents who were not connected to Flint's water system. (*Id.* at 42–43.) Roughly 68% of Legionnaires' patients did not live at a residence connected to Flint water; only 32% did. (*Id.*)

The more conspicuous connection among infected individuals was their visits to a single medical facility during the incubation period: McLaren. (*Id.* at 60–61.) An alarming 51 individuals among the 83 cases with complete exposure histories had an identified healthcare exposure at McLaren. (*Id.*) Further, the majority of cases with

11

McLaren exposure—65%—did not reside on Flint water. (*Id.* at 74.) And among those who died of Legionnaires', this trend was even more prominent: 10 of the 12 Legionnaires' patients who died had McLaren exposure (another had an incomplete history). (*Id.* at 103.)

The strong correlation between McLaren visits and Legionnaires' stands out among the outbreak data. McLaren is not the only hospital or large facility on the Flint water system. Yet no other facility on the Flint water system had a large number of associated Legionnaires' cases. Moreover, if the water switch and pipe corrosion were the primary contributors to the outbreak, epidemiologists would expect to see more cases in other high risk facilities—such as other hospitals, nursing homes, large apartment buildings or similar facilities. (*Id.* at 53–54 & 104.) But that did not manifest. In contrast to McLaren, Hurley Medical Center had just six patients with Legionnaires' cases and three of those were individuals who were *also* treated at McLaren. (*Id.* at 60.) Indeed, McLaren hired Environmental Testing & Consulting, Inc. (ETC) to monitor supply lines coming into the hospital for a 15-day period, and ETC plainly informed McLaren in December 2014 that "the supply water coming from the City of Flint is not

contributing to the Legionella issues at McLaren and . . . any issues *are likely internal to the hospital system*."  (Ex. 10, ETC Letter, emphasis added.)

McLaren's pervasive involvement in the outbreak also hindered MDHHS's ability to identify its source.  To pinpoint a source of infection and respond to an outbreak, two methods of collecting data are crucial: sputum cultures from Legionnaires' patients and environmental isolates from the internal water systems of buildings associated with an infection.  (Ex. 9, at 16–17.)  Sputum is a thick fluid produced in the lungs and adjacent airways.  (*Id.*)  Sputum cultures can be used to detect and identify bacteria infecting the lungs and breathing passages. (*Id.*)  When environmental isolates—bacteria grown from a sample collected from a suspected source of infection, such as a building's cooling tower—are compared with clinical isolates from sputum cultures, source contributions to an outbreak can be better analyzed by MDHHS's Bureau of Laboratories (BOL) by comparing the organisms at the genetic level.  (*Id.* at 16–17 & 35.)  Despite MDHHS encouraging Genesee County hospitals to obtain and submit to BOL sputum samples for this purpose, McLaren mostly did not.  The hospital submitted just

two cultures from the 48 cases of Legionnaires' disease that were "confirmed" at McLaren.  (*Id*. at 34.)

McLaren eventually refused to cooperate with MDHHS during the agency's outbreak investigation, denying the agency access to its facility for a site visit and audit of McLaren's lab reports regarding legionella. *Dept. of Health and Human Svs. v. Genesee Circuit Judge*, 318 Mich. App. 395, 400 (2016).  Thereafter, "[e]fforts made by [MDHHS] to investigate *Legionella* cases at [McLaren] were stymied" as a result of orders issued by a Genesee County Circuit Court judge at the behest of McLaren and others.  *Id*. at 398.  Only after MDHHS sought superintending control from the Court of Appeals in late 2016 was the agency able to obtain information from McLaren regarding the outbreak.

**The State's response to Flint water concerns.**

On October 2, 2015, the Governor held a press conference in Flint at which he announced a 10-part plan to address Flint's water issues. By October 7, 2015, the State Budget Office had located $10.5 million in funds immediately available to implement the Governor's plan.  (*Id*.) On October 14, 2015, the Legislature appropriated an additional $9.35

million to provide water filters, place additional staff in Flint schools, and reconnect Flint to DWSD.

As of December 31, 2017, the Michigan Legislature had appropriated $297,407,800 to Flint to address its water-treatment related issues. http: //www.michigan.gov/flintwater/0,6092,7-345-73947_78591---,00.html. A little over 30% of those funds have not yet been spent. Governor Snyder's 2018 budget allocates an additional $25.9 million to Flint, which would include additional funds for, among other things, the children's health access program, child and adolescent health care expansion, lead abatement activities, the nutrition program, and school nurses and social workers. http: //www.michigan.gov/documents/snyder/Full_FY_2018_budget_proposal_551006_7.pdf.

The State also reached a nearly $100 million settlement in a lawsuit brought under the SDWA's citizen suit provision, *Concerned Pastors for Social Action v. Khouri*, No. 16-10277, (E.D. Mich. April 4, 2017). This agreement requires, among other things, compliance with EPA orders, replacement of lead and galvanized steel service lines, tap water monitoring, water filter installation, and continued funding of health programs for the people of Flint.

Most recently, on April 12, 2018, the State of Michigan entered into a settlement agreement to fund an expansion of efforts by Dr. Mona Hanna-Attisha, the Genesee Health System, and the Flint Registry to ensure that children in Flint have access to services, including neuropsychological exams, specifically designed to evaluate, assess, and treat injuries caused by exposure to lead (regardless of its source).  This settlement makes available many of the medical services being sought through the Flint water litigation.

Flint's lead levels have been in compliance with law for nearly two years.  (Ex. 11, Oswald Decl., at ¶¶ 15–19.)  The latest lead testing results from the independent monitor show Flint's lead levels at 3.9 ppb, even below the 4 ppb that MDEQ's monitoring reveals.  (Ex. 12, Masten Report; Ex. 13, Graphic of Lead Levels.)  That is below the federal allowance for lead in bottled water.  21 C.F.R. § 165.110(b)(4)(iii)(A).  Similarly, Flint is meeting SDWA treatment standards for legionella.  (Ex. 14, February 16, 2018 MDEQ letter to Flint.)

# ARGUMENT

## I.     Plaintiffs' official capacity claims against Governor Snyder are barred by the Eleventh Amendment.

Plaintiffs assert both federal- and state-law claims against Governor Snyder in his official capacity.  But all of these are jurisdictionally barred by the Eleventh Amendment and they do not meet the requirements of an *Ex parte Young* action.  Specifically, Plaintiffs do not allege any ongoing violation of federal law related to legionella, nor can the relief they seek be properly characterized as prospective.

### A.     The Eleventh Amendment bars jurisdiction over the federal- and state-law claims against Governor Snyder in his official capacity.

The Eleventh Amendment bars claims against a state, its agencies and officials unless:  (1) the State has waived immunity by consenting to the suit; (2) Congress has expressly abrogated the State's sovereign immunity; or (3) the *Ex parte Young* doctrine applies.  *Boler v. Earley*, 865 F.3d 391, 410 (6th Cir. 2017).  This jurisdictional immunity applies equally to damages claims against a state official in his official capacity because it is the equivalent of a suit against the State itself.  *Will v.*

17

*Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989).  It also applies

equally to pendant state-law claims.  *Pennhurst State School & Hosp. v.*

*Halderman,* 465 U.S. 89, 120–21 (1984).

Here, the State did not consent to suit.  And neither § 1983 nor §

1985 abrogate Eleventh Amendment immunity.  *Boler,* 865 F.3d at 410–

11.  Therefore, unless Plaintiffs' claims meet the requirements of *Ex*

*parte Young*, they must be dismissed.

>    **B.    The *Ex parte Young* exception does not apply because
>    there is no ongoing violation of federal law and the
>    relief sought is not prospective.**

To avoid Eleventh Amendment immunity, Plaintiffs purportedly

seek only prospective, injunctive and declaratory relief under *Ex parte*

*Young* against the Governor Snyder in his official capacity.  (No. 17-

10164, Master Compl., Dkt. 115, Pg.ID #1376, ¶24.)  Under *Young*,

"plaintiffs must allege an 'ongoing violation of federal law' and seek

'relief properly characterized as prospective,' because the state has not

waived sovereign immunity."  *Guertin v. Michigan,* No. 16-12412, Dkt.

151, Pg.ID #5584 (E.D. Mich. June 5, 2017), *appeal docketed* No. 17-

1698 (6th Cir. June 20, 2017) (citing *Verizon Md., Inc. v. Pub. Serv.*

*Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

Here, Plaintiffs do not allege an ongoing violation of federal law by Governor Snyder, and they acknowledge that Flint has reconnected to the Detroit water system. (No. 17-10164, Master Compl., Dkt. 115, Pg. ID #1412, ¶141.)  This Court may take judicial notice under Federal Rules of Evidence 201 of public records which confirm that Flint's water has met all state and federal water standards since July 2016. (Ex. 14.) And no other ongoing violations of federal law have been alleged.  Nor does the Governor have any control over the water system.  Indeed, Flint's RTAB is dissolved, and the State exercises no special oversight of Flint's finances or any other aspects of its municipal operations.

Moreover, by their own terms, Plaintiffs seek retrospective relief. That is, they seek relief "*to correct the harm caused* and prolonged by state government". (No. 17-10164, Master Compl., Dkt. 115, Pg. ID #1376, at ¶ 24, emphasis added.)  And the only injunctive relief they seek is "*to remediate the harm* caused by Government Defendants' unconstitutional conduct including, but not limited to:  repairs of private property and establishment of medical monitoring to provide health care and other appropriate services to Class members" and "[a]ppointment of a monitor who will assist in the development of

19

*remedial plans*". (*Id.*, Pg. ID #1508, ¶¶ 531.b & 531.c, emphasis added.)[1]  This Court held in a related matter that this same framing of the relief indicated that plaintiffs sought the "very relief they are not permitted to seek against the state under the Eleventh Amendment." *Guertin,* No. 16-12412, Dkt. 151, Pg.ID #5586.

Although in *Boler,* 865 F.3d at 413, the Sixth Circuit (relying on the U.S. Supreme Court's ruling in *Milliken v. Bradley,* 433 U.S. 267 (1977) (*Milliken II*)) held that similar relief was proper, that case does not support the same conclusion here.

In *Milliken II,* the Supreme Court held that Eleventh Amendment immunity did not bar ordering a State to pay for remedial educational programs to redress racial segregation.  433 U.S. at 288–290.  But this conclusion rested on first finding that there was an *ongoing constitutional violation*—racial segregation in the schools.  *Id.* at 282. In other words, the Court held that even though the relief awarded was retrospective, it was within the Court's power under *Young* because it was addressed to correcting an ongoing violation of federal law.

---

[1] Likewise, the more specific allegations of Plaintiffs' short-form complaint identifies only backward-looking injuries for which they seek damages.  (Dkt. 48, Pg. ID #264.)

Here, in contrast, Plaintiffs' complaint does not identify an ongoing violation of federal law by Governor Snyder related to legionella.  Flint water complies with federal standards.  That includes the filtration and disinfection treatment requirements addressing legionella.  *See* 40 C.F.R. § 141.70(a).  No other violations of federal law are alleged.  Yet Plaintiffs seek relief to address the harms allegedly caused by past violations of federal water quality standards.  Such relief can only properly be characterized as retrospective.

Moreover, the declaratory relief sought is unavailable because it has the same effect as awarding money damages.  Plaintiffs ask this Court to declare the Governor's conduct unconstitutional.  (No. 10164, Master Compl., Dkt. 115, Pg.ID #1508, ¶b.)  But even if past actions were unlawful, the Eleventh Amendment prohibits declaratory relief that is the functional equivalent of a monetary award.  *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).  Since Plaintiffs have not alleged that the purported acts will be repeated, such relief would only be useful to the extent it is admissible in other proceedings as to liability for past unlawful acts—in essence, an award for money damages.  Declaratory judgment used in this manner—as an "end run" around *Young's* bar on

21

monetary damages—is unavailable.  *Green v. Mansour*, 474 U.S. 64, 73 (1985).

Further, "*Young* applies only where the underlying authorization upon which the named official acts is asserted to be illegal." *Papasan v. Allain*, 478 U.S. 265, 277 (1986).  Plaintiffs do not allege that any laws or rules are illegal; rather, their claims stem from the allegedly wrongful interpretation or application of those laws and rules, which is dependent on the discretion and actions of lower level officials.  This is not actionable under the *Young* doctrine.

## II.    Plaintiffs fail to state a claim in avoidance of the immunity accorded State Defendants under federal and state law.

In addition to the Eleventh Amendment immunity, Plaintiffs fail to state a claim in avoidance of the immunity accorded Governor Snyder, former Treasurer Dillon, Director Lyon and Dr. Wells in their individual capacities under federal and state law.

### A.   Governor Snyder, former Treasurer Dillon, Director Lyon and Dr. Wells are entitled to qualified immunity.

Plaintiffs' individual-capacity claims against Governor Snyder, former Treasurer Dillon, Director Lyon and Dr. Wells are barred by qualified immunity.

Qualified immunity protects government officials from suit unless they are "plainly incompetent or . . . knowingly violate the law," and "gives ample room for mistaken judgments." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986).  A plaintiff has the burden of establishing that a defendant is not entitled to qualified immunity. *Cartwright v. Marine City*, 336 F.3d 487, 490–91 (6th Cir. 2003) (citation omitted).  "[U]nless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct," state and federal officials are shielded by immunity.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Here, Plaintiffs cannot establish a violation of a constitutional right or demonstrate that such right was "clearly established."

### 1.   Plaintiffs fail to show a constitutional right violation.

As explained in Sections III.B., III.C., and III.D, Plaintiffs' § 1983 claims fail to establish the violation of a constitutional right under any of the theories alleged.  Plaintiffs fail to allege the elements of a state-created danger claim.  There is no constitutional bodily-integrity right to be protected from contaminated water, and the allegations do not meet the "shocks the conscience standard."  Finally, Plaintiffs do not belong to the group allegedly discriminated against and there is no equal-protection right to receive water of the same or similar quality as separate and distinct jurisdictions.

Moreover, as the Sixth Circuit has explained, § 1983 claims "cannot be founded upon conclusory, vague or general allegations, but must instead, allege facts that show the existence of the asserted constitutional rights violation recited in the complaint and what each defendant did to violate the asserted right."  *Terrance v. Northville Regional Psychiatric Hosp.*, 286 F.3d 834, 842 (6th Cir. 2002).  But Plaintiffs' conclusory allegations fail to identify what *each* of these defendants did to violate alleged constitutional rights.  Instead, in each of Plaintiffs' § 1983 claims (Counts I through IV of the master complaint

24

and Count IV of their original complaint), they lump all Defendants together. (No. 17-10164, Master Compl., Dkt. 115, ¶¶287–338.)

Plaintiffs' attempt to base liability on the respective decisions of Flint's emergency managers regarding the City's drinking water fares no better. An emergency manager acts only "for and on behalf of the local government" and "local officials" and his "authority is limited to the local level." *Kincaid v. City of Flint,* 874 N.W.2d 193, 201 (Mich. Ct. App. 2015); *see also* Mich. Comp. Laws §§ 141.1549(2), 141.1552(1)(dd). This analysis is consistent with longstanding Supreme Court precedent recognizing that States can design types of municipal government without turning that municipality into an arm of the State. *See Sailors v. Bd. of Ed., Kent Cty.*, 387 U.S. 105, 107 (1967).

## 2. The right was not "clearly established."

Even if Plaintiffs could establish the violation of a constitutional right, it was not clearly established. To be "clearly established" for qualified immunity purposes, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Although "the very action in question" does not have to

25

have "previously been held unlawful," still, "in light of the pre-existing law, the unlawfulness must be apparent." *Id.* The Supreme Court has required the unlawfulness to be *so* apparent, in fact, that case law places "the statutory or constitutional question *beyond debate.*" *al-Kidd*, 563 U.S. at 741 (citation omitted) (emphasis added).

To apply this principle correctly, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). The Supreme Court has "repeatedly" warned against defining the legal rule "at a high level of generality." *al-Kidd*, 563 U.S. at 742. If the Court were to deny immunity based solely on general legal rules, it would "convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson*, 483 U.S. at 639. Accordingly, the right at issue must be defined in a way that is "particularized" to the facts of the case. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001).

The Supreme Court has required lower courts to "identify a case where [an official] acting under similar circumstances . . . was held to have violated" the law. *White v. Pauly*, 137 S. Ct. 448, 552 (2017). And

the Sixth Circuit emphasized recently that "a plaintiff must identify a case *with a similar fact pattern* that would have given 'fair and clear warning to [officials]' about what the law requires." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (emphasis added) (citing *White*, 137 S. Ct. at 552) (quotation omitted); *see also Scott v. Kent Cty.*, 679 F. App'x. 435, 441 (6th Cir. 2017); & *Evans v. Plummer*, 687 F. App'x. 434, 444 (6th Cir. 2017).

No case supports finding a "clearly established" constitutional violation based on the alleged conduct of Governor Snyder, former Treasurer Dillon, Director Lyon or Dr. Wells.  The sum of the allegations against Governor Snyder are that he:  1) appointed several emergency managers in Flint; 2) knew that the Flint River would be used as an interim water source; 3) participated in developing an "interim" plan to switch the predominately African American community of Flint to the Flint River but keep the predominately white Genesee County water users on water from DWSD; 4) knew about elevated lead levels and an outbreak of Legionnaires' disease in Flint but failed to take action to protect the public; and 5) ordered Flint be reconnected to DWSD on October 8, 2015.  (No. 17-10164, Master

Compl., Dkt. 115, ¶¶ 27, 35–36, 38, 77, 84, 89, 90, 104, 110–12, 117, 127
and 141.)

It is not clearly established that the appointment of an emergency
manager violates a constitutional right.  Nor can the Governor be held
liable for alleged constitutional violations by the emergency managers
simply because the Governor appointed them.  *Hays v. Jefferson Cty.,
Ky.*, 668 F.2d 869, 874 (6th Cir. 1982) (liability under § 1983 cannot be
based on *respondeat superior*).  Likewise, whether the Governor knew
that the Flint River was going to be used as an interim water source
does not place the constitutional question "beyond debate."  No case law
presenting similar facts supports such a conclusion, and the 2011 LAN
Report on which Plaintiffs rely for their assertion that the Flint River
was rejected as a water source actually confirms that the water could be
treated to water quality standards.  (Ex. 2, at 7.)  Thus, even if the
Governor was aware the Flint River was going to be used as an interim
source, there was no reason at the time to believe it could not be
adequately treated.

Further, as explained in Section III.D., the allegation that the
Governor participated in developing an "interim plan" to switch Flint to

the Flint River because it is less affluent and predominantly African American, lacks both factual and legal merit.  The authority to choose a water source lies with the local government, not with the Governor.  And Flint's emergency manager made the choice to switch to the Flint River.  (Ex. 3.)  It was a local decision, not a state one.  Additionally, the Governor cannot be held liable for alleged constitutional violations of others, even those he appoints.  Courts also have not recognized an equal-protection right to provide water of the same or similar quality as *other jurisdictions*.  To the contrary, the SDWA sets the floor on water quality standards, and it applies to all jurisdictions.  The Constitution does not demand that every jurisdiction provide the same water.  But, even if that were not so, Plaintiffs do not belong to the group allegedly discriminated against.

Next, Plaintiffs' allegations that the Governor was aware of the lead and legionella issues in Flint but did not take action to protect the public do not suffice to place the constitutional question "beyond debate."  To the contrary, "liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon a 'mere failure to act.'"  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)

(citation omitted).  No case law with similar facts establishes that a governor's alleged failure to adequately respond to alleged drinking water contamination violates constitutional rights.  This is consistent with the purpose of qualified immunity:  it exists so that competent and qualified individuals will be willing to serve in the public sector without fear of liability.

Finally, the same can be said about Plaintiffs' allegation that Governor Snyder ordered Flint to reconnect to the DWSD.  Even if true, such conduct is not a clearly established constitutional violation, and case law does not suggest otherwise.

As for former Treasurer Dillon, Plaintiffs' allegations are limited to his role in authorizing Flint's decision to terminate its contract with DWSD to join the KWA and participating in creating the "interim plan" to switch Flint to the inferior Flint River while keeping the remainder of Genesee County on DWSD, allegedly based on race and wealth discrimination.  (No. 17-10164, Master Compl., Dkt. 115, ¶¶27, 78–80, 83 and 85–86.)  Under the Local Financial Stability and Choice Act, 2012 P.A. 436, (P.A. 436), if the City of Flint did not want to put the KWA contract out for competitive bidding, it would need the Treasurer

to "authorize that the potential contract is not subject to competitive bidding." Mich. Comp. Laws § 141.1552(3). But again, case law precedent would not have given former Treasurer Dillon fair warning that authorizing a contract to forego competitive bidding violates a constitutional right. And for the same reasons that apply to the Governor (that Genesee County is a separate jurisdiction with its own authority to choose its water source), Plaintiffs' allegations regarding an "interim plan" do not allege the violation of constitutional right recognized in case law. Former Treasurer Dillon had only limited authority to authorize the City of Flint to forego competitive bidding on the KWA project. He had no authority to make the decision to switch. That authority lay with Flint's Emergency Manager. Former Treasurer Dillon also had no authority over Genesee County's decision to stay with DWSD because, unlike Flint, the County was not under emergency management. Therefore, former Treasurer Dillon is entitled to qualified immunity.

Regarding Director Lyon, Plaintiffs allege only that he learned about an outbreak of Legionnaires' disease but failed to report these public health concerns to the Governor's office, other state agencies or

the public. (No. 17-10164, Master Compl., Dkt. 115, ¶¶28, 103, 132–134.)  But it is not "beyond debate" that such alleged failures to adequately respond to a potential health concern establish a constitutional violation.  Nor does the alleged failure to report such a potential health concern to the public, and with good reason:  there is a significant risk of a harmful impact that a false alarm can impose on the public.  This is especially true when the investigation is ongoing and, regarding the outbreak of Legionnaires' disease (which is not communicable), there was a lack of information about its source due to McLaren's failure to collect and report samples and later obstruction of MDHHS's investigation.  And giving a generalized public notice of these public health concerns during the outbreaks when experts at all levels of government were confounded by its unprecedented nature could lead to potential negative consequences to personal health and hygiene and perhaps unnecessarily burden local health care systems.

Similar allegations are made in the one paragraph of the Master Complaint that mentions Dr. Wells.  (*Id.,* at ¶46.)  Plaintiffs allege that she was aware of the lead and legionella issues but failed to go public. (*Id.*)  For the same reasons as those that apply to Director Lyon, these

allegations fail to demonstrate that Dr. Wells would have been on notice that her actions violated a constitutional right.

In sum, based on the scant allegations against them and the nature of the situation in which they all found themselves, it cannot be said that it is "beyond debate" whether these State Defendants acted in violation of clearly established constitutional rights. Governor Snyder, former Treasurer Dillon, Director Lyon and Dr. Wells are entitled to qualified immunity.

## B.    State Defendants are entitled to state-law immunity.

Plaintiffs also assert state-law tort claims against State Defendants for gross negligence and intentional infliction of emotional distress (Counts XII & XIII). These claims are barred by immunity accorded State Defendants by statute and common law.

Under Michigan's Governmental Tort and Liability Act, "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." Mich. Comp. Laws § 691.1407(1). Additionally, "the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to

property if he or she is acting within the scope of his or her . . .
executive authority." *Id.* at § 691.1407(5).  In this context, executive
authority means "all authority vested in the highest executive official
by virtue of his or her position in the executive branch." *Petipren v.
Jaskowski*, 833 N.W.2d 247, 257 (Mich. 2013).  And this immunity
extends to all tort claims, whether based on negligence or intentional
conduct.  *Id.*; *American Transm. v. Attorney Gen.*, 560 N.W.2d 50, 53
(Mich. 1997).

Moreover, "governmental function" is defined as "an activity that
is expressly or impliedly mandated or authorized by constitution,
statute, local charter or ordinance, or other law."  Mich. Comp. Laws §
691.1401(b).  This definition is "to be broadly applied and requires only
that there be some constitutional, statutory or other legal basis for the
activity in which the governmental agency was engaged." *Harris v.
Univ. of Mich. Bd. of Regents,* 219 N.W.2d 679, 684 (Mich. Ct. App.
1996) (quotations and citation omitted).  Importantly, to determine
whether something is a governmental function, courts look "to the
general activity involved rather than the specific conduct engaged in
when the alleged injury occurred." *Genesee Cty. Drain Comm'r v.*

34

*Genesee Cty.,* 869 N.W.2d 635, 642 (Mich. Ct. App. 2015) (quotations and citation omitted).

Governor Snyder, former Treasurer Dillon, Director Lyon and Chief Medical Executive Dr. Wells are all absolutely immune from liability as elective and highest appointive officials of state government acting in the scope of their executive authority.  This Court reached that exact conclusion with respect to Governor Snyder, Director Lyon and Dr. Wells in *Guertin v. Michigan*, No. 16-12412, 2017 WL 2418007, at *26 (E.D. Mich. June 5, 2017).  The same holds true for former Treasurer Dillon because the allegations confirm he was acting within the scope of his authority as the highest appointive official of Michigan's Department of Treasury during the relevant time period.  Therefore, the state-law tort claims are barred.

## III.   Plaintiffs fail to state a claim upon which relief can be granted under federal law.

Additionally, Plaintiffs have failed to state claims for violation of the rights to state-created danger, bodily integrity, equal protection, or access to the courts under § 1983.  And their conspiracy claim under § 1985(3) likewise fails.

### A.    Plaintiffs fail to meet pleading standards.

First, Plaintiffs' claims fail because they have not alleged any plausible claim as they fail to identify an injury traceable to the conduct of State Defendants.

Federal pleading standards require the plaintiff to state "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 8(a)(2) (requiring a "short and plain statement of the claim *showing that the pleader is entitled to relief*") (emphasis added).  A claim is "plausible" only if "the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Plaintiffs do not meet this standard.  All of Plaintiffs' claims derive from the death of Bertie Marble purportedly from legionella pneumonia.  (Dkt. 48, Short Form Compl., Pg ID ##263–68, ¶¶ 6, 9, & 11–13.)  Yet they never affirmatively allege that Bertie Marble was diagnosed as having contracted legionella pneumonia.  To the contrary, they admit "uncertainty" as to the cause of Ms. Marble's death, merely calling legionella the "likely" cause of her death.  (*Id.* at ¶ 9.a & 9.d)

(alleging that they were "prevent[ed] from accurately knowing and understanding why [Bertie Marble] suffered and died" and noting "the uncertainty of the cause of her death"); *see also* (Dkt. 1, Original Compl., Pg ID ##7, 10, & 46 at ¶¶ 9, 19, & 153) (noting she "*likely* died from exposure to this deadly bacteria," that no "definitive cause of death could be established," and expressing "uncertainty" regarding "the cause of her death"). And to the extent that any allegations suggest legionella caused her death, these are undermined by the many assertions that her cause of death was unknown.

Section 1983 claims permit liability only for injuries that are proximately caused by a defendant's wrongful conduct. *Powers v. Hamilton County Pub. Defender Comm'n*, 501 F.3d 592, 609 (6th Cir. 2007). But, here, there is no factual basis for this Court to conclude that—accepting Plaintiffs' allegations as true—State Defendants are responsible for Ms. Marbles' death. Setting aside other deficiencies with those claims, the allegations do not affirmatively connect Ms. Marbles' death to a condition of the water system allegedly caused by State Defendants' conduct.

### B.   Plaintiffs fail to allege the elements of a state-created danger claim.

In Count I, Plaintiffs allege a § 1983 substantive-due-process state-created danger claim.  (No. 17-10164, Master Compl., Dkt. 115, Pg.ID #1456–58, ¶¶ 287–98.)  This Court rejected the same claim in *Guertin v. Michigan,* No. 16-12412, Dkt. 151, Pg.ID #5599–601 (E.D. Mich. June 5, 2017).

The limited obligation of a state actor to protect an individual against private violence arises only where:  (1) an affirmative act by the State either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) the State's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the State knew or should have known that its actions specifically endangered the plaintiff.  *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (citations omitted); *see also Stiles v. Grainger Cty.*, 819 F.3d 834, 854 (6th Cir. 2016).

In *Guertin,* this Court held that the plaintiffs failed to meet the second requirement.  No. 16-12412, Dkt. 151, Pg.ID #5600.  The same is true here.  Plaintiffs fail to show that State Defendants placed them specifically at risk, as distinguished from the public at large.  A "special

danger" exists where "the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims." *Jones*, 438 F.3d at 696. But if "the victim was not identifiable at the time of the alleged state action/inaction . . . a § 1983 suit may not be brought under the 'state created danger' theory." *Id.* at 697. There are no allegations that State Defendants' actions singled out these individual Plaintiffs and placed them at a risk of special danger.

Plaintiffs also fail to meet the first requirement. They assert that the Defendants' acts directly resulted in harm from exposure to toxic water, not that they were exposed to harm by a third party. (No. 17-10164, Master Compl., Dkt. 115, Pg.ID #1456–58, ¶¶287–98.) And Plaintiffs' allegations focus on the decision to use the Flint River as the cause of their injury. (*Id.*, ¶¶75, 76, 86, 87, 88, 92 and 93.) But this decision was made by Flint's former emergency manager, not by State Defendants. (Ex. 3.)

Finally, Plaintiffs have not met the last requirement that State Defendants knew, or should have known, this switch in water sources specifically endangered these Plaintiffs. And such knowledge is central to the third requirement.

### C.    Plaintiffs fail to allege a violation of a recognized bodily integrity right.

Count II alleges a § 1983 bodily-integrity claim. (No. 17-10164, Master Compl., Dkt. 115, ¶¶299–306.)  To state a substantive-due-process claim against an executive official, "plaintiffs must show[] not only that the official's actions shock the conscience, but also that the official violated a right otherwise protected by the substantive Due Process Clause."  *Guertin*, No. 16-12412, Dkt. 151, Pg.ID #5603 (citing *Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010)).  This Court held in *Guertin* that "plaintiffs sufficiently plead that the conduct of many of the individual governmental defendants was so egregious as to shock the conscience and violate plaintiffs' clearly established fundamental right to bodily integrity."  No. 16-12412, Dkt. 151, Pg. ID #5603.  But that result would be incorrect here for two primary reasons.

First, not every legally cognizable injury inflicted by a state official establishes a violation of the Fourteenth Amendment.  *See Paul v. Davis*, 424 U.S. 693, 699 (1976).  "[S]uch a reading would make of the Fourteenth Amendment a font of tort law."  *Id.* at 701.  The Due Process Clause is "phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."  *DeShaney*

40

*v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 195 (1989).  So even if a "State . . . through its courts and legislatures, impose[s] . . . affirmative duties of care and protection upon its agents," the Fourteenth Amendment "does not transform every tort committed by a state actor into a constitutional violation."  *Id*. at 202.  Indeed, the Supreme Court has rejected claims that the Due Process Clause "should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law."  *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992) (citations omitted).

Here, Plaintiffs allege a bodily-integrity right to be free from exposure to bacteriologically contaminated water.  (No. 17-10164, Master Compl., Dkt. 115, ¶ 303.)  But no duty to protect Plaintiffs from contaminated water emanates from the Fourteenth Amendment.  If the State has any such duty, it arises from the SDWA.  And a failure to meet these statutory obligations is not a violation of constitutional proportions.  Moreover, no court has recognized such a constitutional right, and courts have consistently rejected these types of claims. *Coshow v. City of Escondido*, 34 Cal. Rptr. 3d 19, 30 (Cal. App. 4th 2005) (no constitutional right to pure drinking water); *Ely v. Velde*, 451

F.2d 1130, 1139 (4th Cir. 1971) (constitutional protection for the environment not established); *Pinkney v. Ohio Envtl. Prot. Ag.*, 375 F. Supp. 305, 310 (N.D. Ohio 1974) (no constitutional right to a healthful environment); *In re Agent Orange Prod. Liab. Litig.*, 475 F. Supp. 928, 934 (E.D. N.Y. 1979) (same); *Tanner v. Armco Steel Corp.*, 340 F. Supp. 532, 537 (S.D. Tex. 1972) (same).  As the court in *Coshow*, relying on federal authority, explained, "the right to bodily integrity is not coextensive with the right to be free from the introduction of an allegedly contaminated substance in the public drinking water."  34 Cal. Rptr. 3d at 31.

Second, the allegations against Governor Snyder, former Treasurer Dillon, Director Lyon and Dr. Wells do not meet the "shocks the conscience standard."  The Sixth Circuit limits the "shocks the conscience" standard to government conduct that involves the use of physical force.  *Braley v. City of Pontiac,* 906 F.3d 220, 225 (6th Cir. 1990) ("We doubt the utility of such a standard outside the realm of physical abuse . . . ."); *Callihan v. Sudimack*, 117 F.3d 1420, 1997 U.S. App. LEXIS 17731 (6th Cir. 1997); *Mansfield Apartment Owners Ass'n. v. City of Mansfield*, 998 F.2d 1469, 1478 (6th Cir. 1993); *Choate's Air*

*Conditioning & Heating, Inc. v. Light, Gas & Water Div. of the City of Memphis,* 16 F. App'x. 323, 329 (6th Cir. 2001).  There are no allegations against Governor Snyder, former Treasurer Dillon, Director Lyon and Dr. Wells involving physical force directed at Plaintiffs.

Instead, Governor Snyder's asserted liability hinges on an omission—that he learned from his staff and others about an outbreak of Legionnaires' disease in Flint but failed to take action to protect the public.  (No. 17-10164, Master Compl., Dkt. 115, ¶¶ 98, 111–112 and 117.)  And former Treasurer Dillon's liability is based solely on his alleged role in authorizing Flint's decision to forego competitive bidding when Flint decided to join the KWA.  (*Id.,* ¶¶ 27, 78–80, 83 and 85–86.)  Likewise, Director Lyon's liability rests on allegations that he learned about an outbreak of Legionnaires' disease but failed to report these public health concerns to the Governor's office, other state agencies or the public.  (*Id.*, at ¶¶ 28, 103, 132–134.)  And Plaintiffs make similar allegations (regarding failures to report these health concerns) in the one paragraph of the Master Complaint that references Dr. Wells.  (*Id.,* at ¶ 46.)  But mere omissions cannot meet the "shocks the conscience" standard.  *DeShaney,* 489 U.S. at 195 (noting that the Due Process

Clause is "a limitation on the State's power to act, not . . . a guarantee of certain minimal levels of safety and security."); *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007) ("Only an affirmative act can amount to a violation of substantive due process . . . ."). Moreover, none of the allegations against Governor Snyder, former Treasurer Dillon, Director Lyon, and Dr. Wells involve the use of force. Instead, the allegations describe only failure to act or to approve a contract, which cannot be the basis for a bodily-integrity violation.

Similarly, Plaintiffs' allegations cannot establish that Governor Snyder, former Treasurer Dillon, Director Lyon or Dr. Wells acted with the "harmful purpose" or "deliberate indifference" necessary to meet the "shocks the conscience" standard. A government actor's conduct generally only meets the "shocks the conscience" standard if it indicates a harmful purpose. *Range v. Douglas*, 763 F.3d 573, 591–92 (6th Cir. 2014). The focus is not on the results of conduct; rather, the test is an "exact analysis of the circumstances" as they existed at the time. *Id.* at 590 (citation omitted).

A careful analysis is important here as there is a "presumption that the administration of government programs is based on a rational

decision-making process that takes account of competing social, political, and economic forces." *Collins*, 503 U.S. at 128. This is because "substantive due process liability should not be allowed to inhibit or control policy decisions of government agencies, even if some decisions could be made to seem gravely erroneous in retrospect." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.,* 542 F.3d 529, 542 (6th Cir. 2008) (citing *Lombardi,* 485 F.3d at 84 (quotations omitted)).

Here, even if Plaintiffs could show such grave error, the allegations do not show harmful intent. As noted above, Plaintiffs allege only that Governor Snyder, Director Lyon and Dr. Wells were aware of public health concerns but failed to act or to notify the public, and that Governor Snyder and former Treasurer Dillon authorized Flint's choice of the KWA. None of Plaintiffs' allegations support a conclusion that Governor Snyder, former Treasurer Dillon, Director Lyon or Dr. Wells acted with any intent to harm.

Nor can Plaintiffs show that these Defendants acted with "deliberate indifference." The Sixth Circuit has observed that it will not often find the "deliberate indifference" standard satisfied "even where the governmental actor is subjectively aware of a substantial risk of

serious harm . . . if his action was motivated by a countervailing, legitimate governmental purpose." *Hunt*, 542 F.3d at 542.  Thus, Plaintiffs must plead facts showing that State Defendants individually knew of and disregarded an excessive risk to the plaintiff's health or safety. *See Ewolski v. City of Brunswick*, 287 F.3d 492, 513 (6th Cir. 2002).  "Pursuant to this definition, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Sperle v. Mich. Dept. of Corrections*, 297 F.3d 483, 493 (2002) (citing *Farmer v. Brennan*, 511 U.S. 826, 837 (1994)).  Plaintiffs' complaint is devoid of any facts establishing the requisite "deliberate indifference."

Because Plaintiffs' allegations do not show "physical force," an "intent to harm" or "deliberate indifference," they cannot meet the "shocks the conscience" standard that is essential to a substantive-due-process violation.  Count II must be dismissed.

### D.     Plaintiffs fail to state an equal-protection claim.

In Counts III and IV, Plaintiffs assert race- and wealth-based equal-protection violations against Governor Snyder and former Treasurer Dillon.  These claims have no merit.

46

The Equal Protection Clause prevents states from making distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005). A law that neither implicates a fundamental right nor targets a suspect class is accorded rational basis review. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973). The law need only be "rationally related to legitimate government interests," *Doe v. Mich. Dept. of State Police*, 490 F.3d 491, 501 (6th Cir. 2007) (internal quotation marks and citation omitted), and "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). A law that burdens a fundamental right or targets a suspect class is generally "subject to strict scrutiny and will be upheld only when it is narrowly tailored to a compelling governmental interest." *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007) (internal quotation marks omitted).

### 1. As a threshold matter, Plaintiffs belong to the comparator group and not the group allegedly discriminated against.

To begin with, the equal protection claims as stated in the master complaint are inconsistent with Plaintiffs' individual allegations. Therefore, Plaintiffs' claims cannot stand.

The master complaint claims allege that the City of Flint was discriminated against and treated differently than other communities in Genesee County because it is a predominantly African American city. (*Walters,* Dkt. 115, Pg ID 1461–62, ¶¶ 316–20.)  But Plaintiffs' claims in this matter are derivative of alleged injuries to decedent Bertie Marble, and Ms. Marble was a resident of Grand Blanc—not Flint.  (Dkt. 1, Original Compl., Pg. ID #11, ¶ 23.)  Because Plaintiffs allege Ms. Marble was a member of the comparator group and not the group alleged to have been discriminated against, her claim fails.

### 2. The "similarly situated" requirement has not been met.

Plaintiffs' equal protection claims also fail at the outset because the "similarly situated" requirement is not met.  The Equal Protection Clause "embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793,

799 (1997).  Thus, as a threshold matter, a successful equal-protection claim requires that "the government treated the plaintiff disparately as compared to similarly situated persons."  *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotation marks omitted).  "To satisfy this threshold inquiry, [a plaintiff] must allege that it and other individuals who were treated differently were similarly situated in all material respects."  *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005).  In determining whether individuals are "similarly situated," a court should "not demand exact correlation, but should instead seek relevant similarity."  *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000) (citation omitted).

Here, Plaintiffs claim discrimination against water users in the City of Flint, a local unit of government that at the time relevant to Plaintiffs' complaint was under the administration of an emergency manager.  Plaintiffs allege that the City was disparately treated as compared to the other water users of Genesee County, which is a local unit of government *not* under emergency management and which also operates its own water system.  The two are not similarly situated in relevant respects.  Flint underwent a rigorous preliminary and full

49

review of its financial condition and was determined to be in a financial emergency. *See* Mich. Comp. Laws § 141.1444; § 1445. Neither the race nor wealth of its citizens was a factor in either of these reviews. Likewise, neither was a factor in the determination that a financial emergency existed within that local government. Mich. Comp. Laws § 1444(2); Mich. Comp. Laws §§ 1445(3)(a)-(m) (identifying the factors analyzed to determine the existence of a financial emergency).

Plaintiffs are not similarly situated to water users of local units of government that have not been declared to be in a financial emergency. The existence of a financial emergency in the local unit of government is a relevant factor to determining whether the classes are similarly situated because it is a primary reason the City switched water sources. Plaintiffs' comparison to Genesee County, therefore, does not advance their claims. As a result, Plaintiffs have failed to make the threshold showing that they were treated differently than individuals similarly situated in all material respects, and no further analysis is necessary. And even if the Court advances past the threshold similarly-situated inquiry, Plaintiffs' equal-protection claims fail.

### 3.    No fundamental right is involved.

Plaintiffs allege race and wealth-based equal-protection violations, not violations of a fundamental right.  Moreover, as explained in Section III.C., no fundamental right is involved here.

### 4.    There is no race-based discrimination.

In Count III, Plaintiffs vaguely assert that Governor Snyder and former Treasurer Dillon "engaged in conduct and/or adopted laws and policies" that discriminated against Plaintiffs based on race.  (No. 17-10164, Master Compl., Dkt. 115, ¶ 308.)  Even if the similarly situated requirement were met, the race-based equal protection claim fails because it does not allege a discriminatory purpose.

Plaintiffs' claim centers on the decision to switch to the allegedly "grossly inferior" Flint River.  (*Id.*, at ¶ 312–313.)  But that decision was made by Emergency Manager Kurtz, who had authority to act on behalf of Flint as set forth in the Local Stability and Financial Control Act, Public Act 436 (P.A. 436); Mich. Comp. Laws § 141.1549(2).  Public Act 436 does not embody a racial classification, and it neither says nor implies that local governments are to be treated differently based on their racial composition.  The purpose of the Act—ensuring local

governments can continue to provide services while resolving financial emergencies—encompasses any local unit of government in financial distress, regardless of the racial makeup of its population.  Thus, P.A. 436 is facially neutral and the Emergency Manager's discretionary decision to switch water sources for financial reasons lacked any discriminatory intent.

Where non-discriminatory conduct is authorized by facially neutral legislation, strict scrutiny applies only if the plaintiff can prove that conduct "was motivated by a racial purpose or object, or is unexplainable on grounds other than race." *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 369 (6th Cir. 2002) (internal quotation marks and citations omitted).  Further, "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–65 (1977).  Thus, even assuming for purposes of this brief that the Emergency Manager's discretionary decision authorized by P.A. 436 disproportionately affected this majority African-American community, Plaintiffs still must show that the Act or conduct was enacted or implemented with a discriminatory purpose.

The Supreme Court has identified five factors relevant to determining whether facially neutral government action was motivated by a racially discriminatory purpose: (1) the impact on particular racial groups, (2) the historical background of the challenged decision, especially if it reveals numerous actions being taken for discriminatory purposes, (3) the sequence of events that preceded the action, (4) procedural or substantive departures from the government's normal procedural process, and (5) the legislative or administrative history. *Id*. at 266–68; *see also Moore*, 293 F.3d at 369–370.

Attempting to address these factors, Plaintiffs allege that "Defendants devised an Interim Plan that caused the predominantly white users of those areas of Genesee County outside of Flint to receive the safe and superior water from DWSD, whereas the water users of predominantly African American Flint received water that was known to be grossly inferior and unsafe, i.e. Flint River water." (No. 17-16164, Master Compl., Dkt. 115, ¶ 316.) But this allegation does not reveal a discriminatory purpose. Under P.A. 436, Kurtz's authority was limited to making decisions impacting Flint. He had no authority to decide whether or not the remainder of Genesee County would switch to the

Flint River.  That authority rests with the Genesee County Drain Commissioner, who is responsible for the water supply in the majority of Genesee County communities.  (Ex. 4.)

Plaintiffs next allege that the "cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less than the cost of upgrading the Flint WTP in order to safely process the raw Flint water" and that "the clear difference in treatment between these two groups of similarly situated water users" demonstrates that the decision to switch was the product of racial discrimination.  (No. 17-10164, Master Compl., Dkt. 115, ¶¶ 317–318.)

Even if cost did not support the decision, it does not lead to the inference that race was in fact the motivation for the decision, much less that it was "unexplainable on grounds other than race." *Arlington Heights*, 429 U.S. at 266.  Also, the decision to use the Flint River cannot be said to have a disparate impact as compared to Genesee County because, as noted above, Emergency Manager Kurtz's authority was limited; it could only reach Flint.  And Flint River water was delivered to *all* of Flint's water system's customers, regardless of their

race.  The fact that Genesee County customers—who are on a separate water system under different management and not subject to Flint's Emergency Manager's orders—opted to stay with DWSD does not demonstrate that race was a motivating factor.

Given Plaintiffs' failure to establish a racially discriminatory purpose, rational-basis review is appropriate here.  To survive that review, government action need only be "rationally related to legitimate government interests," *Doe*, 490 F.3d at 501 (internal quotations and citation omitted), and "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," *FCC*, 508 U.S. at 313. "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne, Tex v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

Michigan has a legitimate government interest in preventing or rectifying the insolvency of its political subdivisions.  Moreover, "[i]mproving the financial situation of a distressed locality undoubtedly

is a legitimate legislative purpose, and P.A. 436, while perhaps not the
perfect remedy, is one that is rationally related to that purpose."
*Phillips v. Snyder*, 836 F.3d 707, 718 (6th Cir. 2016).  The insolvency of
a local unit of government threatens the health, safety, and welfare of
its residents.  *Id.*  It also threatens the interests of the citizens of this
State because it is detrimental to the State's credit and overall economic
condition.  *See* Mich. Comp. Laws § 141.1543(a) and (b).  Decisions
made by state officials or local emergency managers addressing
solvency issues thus survive rational-basis review.

### 5.    There is no wealth-based discrimination.

In Count IV, Plaintiffs vaguely assert that Defendants Snyder and
Dillon "engaged in conduct and/or adopted laws and policies" that
discriminated against Plaintiffs because they are less affluent than
other water users in Genesee County.  (No. 17-10164, Master Compl.,
Dkt. 115, ¶¶ 324, 332–333.)

This claim fails because P.A. 436 does not discriminate against
local units of government, let alone their water users, based on wealth
(or poverty).  It is the overall financial management, condition and
prognosis of a local unit of government that will subject it to review and

the possible appointment of an emergency manager under P.A. 436. Mich. Comp. Laws § 141.1444; § 1445.  For example, no local government whose financial management and condition are in order would be subject to review under P.A. 436, whatever the "wealth" of its residents or water users.  *Id.*

Again, Plaintiffs' claim is based on the discretionary decision made by an emergency manager, which they allege was based on the wealth status of the members of the community.  Wealth-based classifications do not discriminate against a suspect class, and thus to the extent the decision to switch water sources could be construed as discriminating against individual citizens based on wealth, it is subject to rational basis review.  *Phillips,* 836 F.3d at 719.  But as explained in Section III.D.4., discretionary decisions made by government officials to address solvency issues survive rational-basis review.  *Id.* at 718. Plaintiffs therefore fail to state a wealth-discrimination claim.

### E.     There is no *respondeat superior* liability under § 1983.

Liability under § 1983 must be based on more than *respondeat superior*, or the right to control employees.  *Hays,* 668 F.2d 869 at 874. Unless the supervisor "either encouraged the specific incident or

misconduct or in some other way directly participated in it," no liability attaches. *Id*. This means that "liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon a 'mere failure to act.'" *Shehee*, at 300 (citation omitted).

Plaintiffs fail to allege specific facts establishing liability on the part of the Governor Snyder, former Treasurer Dillon, Director Lyon and Dr. Wells based on "active unconstitutional behavior" and not a 'mere failure to act.'" Instead, the allegations lump all "Defendants" together rather than identify the specific unconstitutional behavior each engaged in that supports Plaintiffs' substantive-due-process or equal-protection theories of liability. (No. 17-10164, Master Compl., Dkt. 115, ¶¶ 289–292, 294–296, 298, 301–306, 311–316, 318, 321, 327–332, 334 and 337–338.) And the alleged liability is based solely on executive and supervisory responsibilities or failure to act, (*Id.,* at ¶¶ 27–28, 46, 78–80, 83, 85–86, 103, 111–112, 117, 132–134), which is insufficient. Because Plaintiffs' claims are premised on no more than *respondeat superior*, they fail as a matter of law and fact.

58

### F.   Plaintiffs fail to state a claim for conspiracy under 42 U.S.C. § 1985(3).

Plaintiffs allege a claim under 42 U.S.C. § 1985(3), which the Supreme Court has concluded is "not intended to apply to all tortious, conspiratorial interferences with the rights of others" but rather to those based on "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).  In implementing *Griffin* and its progeny, the Sixth Circuit held that § 1985(3) involves only conspiracies against classes that "receive heightened protection under the Equal Protection Clause" or "'individuals who join together as a class for the purpose of asserting certain fundamental rights.'"  *Bartell v. Lohiser*, 215 F.3d 550, 560 (6th Cir. 2000) (quoting *Browder v. Tipton*, 630 F.2d 1149 (6th Cir. 1980)).

First, Plaintiffs do not—and cannot—allege discriminatory animus based on their membership in a protected class.  (No. 17-10164, Master Compl., Dkt. 115, ¶ 21) (describing Plaintiffs as "residents of Flint, Michigan" and "property owners who have had property located in Flint.").  Although Plaintiffs attempt to plead this as a race-based conspiracy, all Flint water users—minority, non-minority, commercial,

59

residential, and governmental—received the water that is the basis for this claim.

Second, Plaintiffs do not—and cannot—allege discriminatory animus against a fundamental right.  As stated in Section III.C., no court has recognized a fundamental right to properly treated water that would otherwise support a claim under § 1985(3).

Accordingly, Plaintiffs' § 1985(3) claim against State Defendants fails as a matter of law and must be dismissed.

### G.     Plaintiffs fail to state a denial of access-to-courts claim.

Lastly, it is unclear whether Plaintiffs intend to assert a due process claim against State Defendants based on an alleged denial of access to the courts.  Plaintiffs asserted such a claim in their original complaint.  (Dkt. 1, Pg ID ##44–46.)  The amended, short-form complaint expressly incorporates that claim as against Defendant McLaren Hospital.  (Dkt. 48, Pg ID ##267–69.)  It is ambiguous, at best, whether they intend to assert the claim against State Defendants.

Assuming they intend to do so, that claim fails as well.  The U.S. Supreme Court has recognized a constitutional right of "access to the

courts" arising from the Due Process Clause of the Fourteenth Amendment, *Bounds v. Smith*, 430 U.S. 817, 821 (1977), and the First Amendment, *Turner v. Safley*, 482 U.S. 78, 84 (1987), among other constitutional provisions. *See, e.g., Swekel v. City of River Rouge*, 119 F.3d 1259, 1261 (6th Cir. 1997). Claims based on an alleged denial of right to access the courts can be forward-looking, seeking to clear some obstacle to the ability to bring a suit, *Flagg v. City of Detroit*, 715 F.3d 165, 173 (6th Cir. 2013), or backward-looking, accusing the government of "concealing or destroying evidence so that the plaintiff is unable to ever obtain an adequate remedy on the underlying claim," *id*. Backward-looking claims "are much less established than forward-looking claims . . . ." *Id*. Such claims require plaintiffs to demonstrate: "(1) a non-frivolous underling claim, (2) obstructive actions by state actors, (3) 'substantial prejudice' to the underlying claim that cannot be remedied by the state court, and (4) a request for relief that the plaintiff would have sought on the underlying claim and is now otherwise unattainable." *Id*. at 174 (citations omitted).

Plaintiffs' claim is framed as backward looking here, but they have not stated a backward-looking denial-of-access claim for several

reasons.  First, they have failed to identify the nature of the underlying

cause of action they *would* have against State Defendants but for the

alleged wrongful conduct.  The right of access "is ancillary to the

underlying claim, without which a plaintiff cannot have suffered injury

by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415

(2002).  It exists "to provide some effective vindication for a separate

and distinct right to seek judicial relief for some wrong." *Id.* at 414–15.

Therefore, "the named plaintiff must identify a 'nonfrivolous,' 'arguable'

underlying claim" which "must be described in the complaint"

sufficiently "to give fair notice to a defendant." *Id.* at 415–16.  This

requirement serves, among other purposes, as "a hedge against the risk

that an access claim be tried all the way through, only to find that the

court can award no remedy that the plaintiff could not have been

awarded on a presently existing claim." *Id.* at 416.

Plaintiffs have not met this requirement because they fail to

sufficiently describe the cause(s) of action they have "lost."  (Dkt. 1, Pg.

ID ##44–48).  Instead, like in *Christopher*, Plaintiffs do "not come even

close to stating a constitutional claim for denial of access upon which

relief could be granted" because they "fai[l] to identify the underlying

cause of action that the alleged deception had compromised . . . ." 536 U.S. at 418.

Second, Plaintiffs do not allege that they first attempted to access state courts before filing this suit and could not obtain an effective remedy. The Sixth Circuit has established the rule that, "[b]efore filing an 'access to courts' claim, a plaintiff must make some attempt to gain access to the courts; otherwise, how is this court to assess whether such access was in fact 'effective' and 'meaningful'?" *Swekel*, 119 F.3d at 1259. Yet Plaintiffs do not allege that they have attempted to access state courts.

Third, Plaintiffs cannot demonstrate how their denial-of-access claim would "provide a remedy that could not be obtained on an existing claim." *Christopher*, 536 U.S. at 419. A brief comparison of the relief sought in their denial-of-access claim, (Dkt. 1, Pg. ID 47–48), to the relief sought for other claims stated in their short-form complaint, (Dkt. 48, Pg. ID #364), indicates that the two are substantively identical. In other words, the claims that Plaintiffs are currently maintaining against State Defendants and others—setting aside the merits—could provide them with the same relief sought in their denial-of-access claim.

Therefore, a denial-of-access claim is unavailable. *Flagg*, 715 F.3d at 174.

Finally, Plaintiffs do not sufficiently allege any wrongful conduct by State Defendants. A backward-looking claim "must describe the official acts frustrating the litigation." *Christopher*, 536 U.S. 415. Because there is no *respondeat superior* or other vicarious liability, "a plaintiff must demonstrate that the actor 'directly participated' in the alleged misconduct," and "it is not enough to show that the actor merely failed to act against the misconduct of which he was aware." *Flagg*, 715 F.3d at 174.

Plaintiffs' denial-of-access claim does not even mention either Governor Snyder or Treasurer Dillon. Dr. Wells is mentioned only as being "aware as early as October, 2014" of a legionella problem in Flint water (never mind that she was not Chief Medical Executive until May 2015). (Dkt. 1, Pg ID #45, ¶ 147); (Ex. 15, Wells Bio). Further, their allegations against Director Lyon are conclusory, stating that "Lyon and McLaren conspired with the other Government Defendants to cover-up evidence that the Flint River water was the source of the illnesses and deaths caused by exposure to the legionella bacteria." (*Id*. at ¶ 150.)

None of these conclusory allegations, tested by the plausibility pleading standard of *Iqbal*, 556 U.S. at 678, allege wrongful conduct by any of State Defendants sufficiently to state a denial-of-access claim.

## IV.   Plaintiffs fail to state a claim under state law.

Because the Court should dismiss Plaintiffs' federal law claims as a result of this motion, it should also decline to exercise discretionary, supplemental jurisdiction over Plaintiffs' state-law claims against State Defendants.  28 U.S.C. § 1367(c)(3).

If the Court opts to exercise its discretionary jurisdiction over those claims, then the claims must be dismissed because State Defendants are absolutely immune from state-law-tort claims under Michigan law.  But even if this Court disagreed, Plaintiffs fail to state a claim for relief under any of the theories alleged:  ELCRA, gross negligence, intentional and negligent infliction of emotional distress, and punitive damages.

**A.    Plaintiffs fail to state a claim for violation of ELCRA because neither intentional discrimination nor disparate treatment have been established.**

Plaintiffs bring an ELCRA claim against Governor Snyder and former Treasurer Dillon.  Specifically, Plaintiffs allege a violation of Mich. Comp. Laws § 37.2302(a), which requires a plaintiff to establish four elements:  (1) discrimination based on a protected characteristic; (2) by a person; (3) resulting in the denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations; and (4) of a place of public accommodation.  *Haynes v. Neshewat*, 729 N.W.2d 488, 492 (Mich. 2007).

In the public service context, to prove discrimination based on race, a plaintiff must show either intentional discrimination or disparate treatment by the defendant.  *Clarke v. K Mart Corp.*, 495 N.W.2d 820, 822 (Mich. Ct. App. 1992).  Proving intentional discrimination requires a plaintiff to show that he or she is a member of a protected class, that the decision-maker had a pre-disposition to discriminate against members of the protected class, and the decision-maker acted on that pre-disposition.  *See Reisman v. Regents of Wayne State Univ.*, 470 N.W.2d 678, 685 (Mich. Ct. App. 1991).  Proving

disparate treatment requires a plaintiff to show that he or she is a member of a protected class and was treated differently than persons of a different class for the same or similar conduct. *Id.* And both theories require a plaintiff to produce some facts from which a factfinder could reasonably infer unlawful motivation. *See Fonseca v. Michigan State Univ.*, 542 N.W.2d 273, 275 (Mich. Ct. App. 1995).

These Plaintiffs have not alleged facts showing that either Governor Snyder or former Treasurer Dillon had a predisposition to discriminate against individuals on account of their race. In addition, as noted above in Section III.D.4., Plaintiffs have failed to show that they were treated differently than persons of a different class for the same or similar conduct (and Ms. Marble was not even a resident of Flint). Flint's water users were all treated equally: they all received the same water irrespective of their race, residential or business status. Thus, Plaintiffs have not proven the underlying violation of the ELCRA. They also fail to allege facts supporting their assertion that Governor Snyder or former Treasurer Dillon "aided" in denying them full and equal enjoyment of water services. Absent such allegations, Plaintiffs

cannot make out a claim under the ELCRA, and Count VI should be dismissed.

**B.      Plaintiffs have not stated a claim for gross negligence because it is not an independent cause of action under Michigan law.**

As this Court noted in *Guertin*, "gross negligence is not an independent cause of action under Michigan law."  No. 16-12412, 2017 WL 2418007, at *30 (E.D. Mich. June 5, 2017) (citing *Buckner v. Roy,* No. 15-10441, 2015 U.S. Dist. LEXIS 108371, at *23 (E.D. Mich. Aug. 18, 2015).  Thus, Plaintiffs' gross negligence claim against State Defendants should be dismissed.

**C.      Plaintiffs' intentional-infliction-of-emotional-distress claim fails because no conduct by State Defendants, as alleged, supports this claim.**

A claim for intentional infliction of emotional distress consists of three elements:  (1) conduct outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable; (2) intent or recklessness; and (3) causation of severe emotional distress.  *Roberts v. Auto Owners Ins. Co.*, 374 N.W.2d 905, 908 (Mich. 1985).

This claim, like all the others, is premised on Plaintiffs' alleged exposure to contaminated drinking water.  But again, State Defendants did not operate, regulate, monitor, or test the Flint water system or the water it provided.  And Director Lyon's and Dr. Wells' actions were reasonably related to an analysis of the legionella data.  As a result, no conduct by State Defendants supports this claim.

### D.   "Punitive damages" is not an independent cause of action, and Plaintiffs have failed to plead statutory authorization for punitive damages.

Plaintiffs do not assert a particular cause of action in Count XV. Instead, they request punitive damages. (No. 17-10164, Master Compl., Dkt. 115, ¶¶440–443.)  Count XV should be dismissed because it is not a separate cause of action, only a form of relief.  Moreover, as this Court recognized in *Guertin,* "punitive damages are generally not recoverable in Michigan with the exception of when they are expressly authorized by statute."  No. 16-12412, 2017 WL 2418007, at *31 (E.D. Mich. June 5, 2017) (citing *Casey v. Auto Owners Ins. Co.*, 729 N.W.2d 277, 286 (Mich. Ct. App. 2006)).  Here, Plaintiffs have not identified any statute authorizing their request for punitive damages, and therefore dismissal of this claim is proper.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons and those set forth in the accompanying motion, State Defendants respectfully request that the claims asserted against them by Plaintiffs be dismissed for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) and failure to state a claim under Rule 12(b)(6).

Respectfully submitted,

/s/ Zachary C. Larsen

|  |  |
|---|---|
| Eugene Driker (P12959) | Richard S. Kuhl (P42042) |
| Morley Witus (P30895) | Margaret A. Bettenhausen (P75046) |
| Todd R. Mendel (P55447) | Nathan A. Gambill (P75506) |
| Special Assistant Attorneys | Zachary Larsen (P72189) |
| General | Assistant Attorneys General |
| for Governor Richard D. Snyder | Environment, Natural Resources, |
| Barris, Sott, Denn & Driker, | and Agriculture Division |
| PLLC | Attorneys for State Defendants |
| 333 W. Fort Street, Suite 1200 | P.O. Box 30755 |
| Detroit, MI 48226 | Lansing, MI 48909 |
| (313) 965-9725 | (517) 373-7540 |
| edriker@bsdd.com | kuhlr@michigan.gov |
| mwitus@bsdd.com | bettenhausenm@michigan.gov |
| tmendel@bsdd.com | gambilln@michigan.gov |
|  | larsenz@michigan.gov |

Dated:  May 30, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2018, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

Respectfully submitted,

*/s/ Zachary C. Larsen*

| | |
|---|---|
| Eugene Driker (P12959) | Richard S. Kuhl (P42042) |
| Morley Witus (P30895) | Margaret A. Bettenhausen (P75046) |
| Todd R. Mendel (P55447) | Nathan A. Gambill (P75506) |
| Special Assistant Attorneys | Zachary Larsen (P72189) |
| General for Governor Richard | Assistant Attorneys General |
| D. Snyder | Environment, Natural Resources, |
| Barris, Sott, Denn & Driker, | and Agriculture Division |
| PLLC | Attorneys for State Defendants |
| 333 W. Fort Street, Suite 1200 | P.O. Box 30755 |
| Detroit, MI 48226 | Lansing, MI 48909 |
| (313) 965-9725 | (517) 373-7540 |
| edriker@bsdd.com | kuhlr@michigan.gov |
| mwitus@bsdd.com | bettenhausenm@michigan.gov |
| tmendel@bsdd.com | gambilln@michigan.gov |
| | larsenz@michigan.gov |

S:\CEPB3\ENRA_Flintwater\USDC-Marble (AG# 2017-0199956-A)\Pleadings\Final (Word Versions)\Motion To Dismiss 2018-05-30.Docx