## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

*In re* Flint Water Cases.

Judith E. Levy
United States District Judge

_____/

This Order Relates To:

Marble, *et al.* v. Snyder, *et al.*
Case No. 17-12942

_____/

## AMENDED OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' SHORT-FORM COMPLAINT

This is one of the many cases that are collectively referred to as the Flint Water Cases. Defendants, a combination of private and public individuals and entities, allegedly set in motion a chain of events that led to bacteria and lead leaching into the City of Flint's drinking water. Plaintiffs claim that Defendants subsequently concealed, ignored, or downplayed the risks that arose from their conduct, causing them serious harm. These plaintiffs contend that the impact of what has since been called the Flint Water Crisis is still with them and continues to cause them problems.

This Court has previously adjudicated other motions to dismiss in the Flint Water Cases. First, there was *Guertin v. Michigan*, No. 16-cv-12412, involving two individual plaintiffs and many of the same claims and Defendants in the present case. Next, there was *Carthan v. Snyder*, No. 16-cv-10444, a consolidated class action that also involved similar Defendants and claims. Most recently were *Walters v. City of Flint*, No. 17-cv-10164, *Sirls v. Michigan*, No. 17-cv-10342, and *Brown v. Snyder*, 18-cv-10726, which involved individual plaintiffs and the same Master Complaint as the present case.

This case involves similar underlying facts, claims, and Defendants as there are in other Flint Water Cases. Accordingly, this opinion will rely on the Court's earlier rulings to resolve the current motions where appropriate. Importantly, the focus in this case is on *legionella* bacteria, and it includes McLaren Regional Medical Center as a Defendant. The Plaintiffs here are the Estate of Bertie Marble and her family, and so this opinion will describe Plaintiffs' legal claims and then explain why a similar or different result is justified based on the factual allegations pleaded here. For the reasons set forth below, the Court grants in part and denies in part Defendants' motions to dismiss the complaint.

## I.  Procedural History

Plaintiffs originally filed this lawsuit in late 2017. At that time, it was one of many individual Flint Water cases. As the number of lawsuits grew, the Court appointed co-liaison lead counsel to coordinate the individual lawsuits. It also directed co-liaison lead counsel to file a Master Complaint that would apply to all pending and future non-class action cases.[1] The attorneys in each of these cases were ordered to also file a Short Form Complaint, adopting only the pertinent allegations from the Master Complaint as they saw fit. The Short Form Complaints also allowed for an Addendum if any plaintiffs wished to allege a new cause of action or include additional defendants. This would allow the Court to issue opinions that would apply to multiple individual cases, rather than to address each case in turn and cause a delay in the administration of justice.

After the Court ruled on motions to dismiss in *Walters v. City of Flint*, No. 17-cv-10164 and *Sirls v. Michigan*, No. 17-cv-10342, the Court

---

[1] The Court put in place a similar process to manage the putative class action side of the Flint Water cases. *See Carthan v. Snyder*, No. 16-cv-10444. In *Carthan*, the Court granted in part and denied in part the Defendants' motions to dismiss. 384 F. Supp.3d 802 (E.D. Mich. 2019).

instructed Plaintiffs to amend their complaint in this case using the Short Form Complaint from *Walters* and *Sirls*, which Plaintiffs did on September 9, 2019. Plaintiffs adopted the Master Complaint from *Walters* in full and included an Addendum with new allegations and defendants. (ECF Nos. 143, 143-1.) Soon after, Defendants moved to dismiss the complaint and on January 22, 2020, the Court heard oral argument on those motions.

## II. Background

### A. The Parties

Plaintiffs are members of Bertie Marble's family and her Estate. Bertie Marble died on March 20, 2015, while she was a patient at McLaren Regional Medical Center. Plaintiffs allege that she died of a *legionella*-related illness resulting from exposure to Flint's water at McLaren Regional Medical Center. Bertie Marble's family maintains that her true cause of death was concealed from them to cover up the problems with Flint and McLaren's water. Plaintiffs sue the following individuals and entities:

*The State Defendants.* The State Defendants include Rick Snyder, the former Governor of Michigan;[2] Andy Dillon, former Treasurer for the State of Michigan; Nick Lyon, the former Director of the Michigan Department of Health and Human Services ("MDHHS"); and Eden Wells, the former Chief Medical Executive for MDHSS.

*The MDEQ Defendants.* Michigan Department of Environmental Quality ("MDEQ") Defendants include Daniel Wyant, Director of the MDEQ; Liane Shekter Smith,[3] MDEQ Chief of the Office of Drinking Water and Municipal Assistance; Stephen Busch, an MDEQ District Supervisor; Patrick Cook, a former specialist for the Community Drinking Water Unit; Michael Prysby, a former Environmental Quality District 8 Water Supervisor; and Bradley Wurfel, the MDEQ Director of Communications.[4]

---

[2] Plaintiffs sue former Governor Snyder in his official and individual capacities. For the sake of consistency with earlier Flint water decisions, former Governor Snyder will be referred to as Governor Snyder or the Governor where the claim is against him is in his individual capacity. Where the claim is against him in his official capacity, the claim is now against Governor Gretchen Whitmer. *See* Fed. R. Civ. P. 25(d). But, again, for consistency, the Court will still refer to Governor Snyder.

[3] In this Court's prior opinions, Shekter Smith's name was set forth as "Shekter-Smith." When quoting these past opinions, the Court will maintain the original spelling so as to avoid confusion.

[4] Plaintiffs named Adam Rosenthal as a defendant in their Addendum to the Short Form Complaint, (ECF No. 143-1, PageID.3208) but did not check his name off

*The City Defendants*. The City Defendants include Edward Kurtz, Flint's Emergency Manager from August 2012 to July 2013; Darnell Earley, Emergency Manager from November 2013 to January 2015; Gerald Ambrose, Emergency Manager from January 2015 to April 2015; Dayne Walling, Mayor of Flint from August 2009 to November 2015; Howard Croft, Flint's former Director of Public Works; Michael Glasgow, the former City of Flint Laboratory and Water Quality Supervisor; Daugherty Johnson, Flint's former Utilities Administrator; and the City of Flint.

*Jeff Wright*. Wright is the Genesee County Drain Commissioner and Chief Executive Officer of the Karegnondi Water Authority ("KWA").

*The Private Defendants*. The private defendants include Lockwood, Andrews & Newman, PC, Lockwood Andrews & Newman, Inc., and the Leo. A. Daly Company (collectively "LAN"); Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC (collectively "VNA"); and McLaren Regional Medical

_____

on the box provided in the Short Form Complaint or properly name him as an additional defendant in the Short Form Complaint itself. Paragraph 13 of the Short Form Complaint clearly instructs a plaintiff to name additional defendants in the space provided. (ECF No. 143, PageID.3191.) Because he was not properly named, Adam Rosenthal is not a defendant in this case.

Hospital. LAN performed work as a consultant related to Flint's transition to the Flint River and continued to advise Flint on water quality issues during the Flint Water Crisis. VNA performed water consultancy work in Flint after the transition, in February and March 2015. McLaren is a major hospital in the City of Flint, and is the site where Plaintiffs allege Bertie Marble was exposed to *legionella* bacteria.

## B.   The Facts

Plaintiffs' Short Form Complaint fully adopts the facts alleged in the Master Complaint from *Walters*. (*Walters*, No. 17-cv-10164, ECF No. 185-2.) These facts, setting forth the background of the Flint Water Crisis, were summarized in this Court's opinion in *Walters* and will not be reproduced here. *Walters v. City of Flint*, No. 17-cv-10164, 2019 WL 3530874, at *4–*11 (E.D. Mich. Aug. 2, 2019).

Plaintiffs' Addendum to the Short Form Complaint mimics many of the facts from the Master Complaint in *Walters*, but it adds some new allegations and defendants. In particular, the Addendum alleges a multi-defendant conspiracy to hide Flint's *legionella* outbreak. However, unlike *Walters*, Plaintiffs do not allege injuries from lead poisoning. Also, unlike

*Walters*, many of the events and actions after March 2015 are not relevant here because Bertie Marble died on March 20, 2015.

*Bertie Marble's Death from Legionnaires' Disease*

Bertie Marble was a patient at McLaren Regional Medical Center in March 2015. (ECF No. 143, PageID.3186.) Plaintiffs allege that she contracted Legionnaires' disease due to a *legionella* infection she contracted while at McLaren, and that she subsequently died from it. (*Id.* at PageID.3195.) Legionnaires' disease is a severe type of pneumonia. Individuals can contract the disease if they breathe in water droplets containing *legionella* bacteria or if *legionella*-contaminated water enters their lungs while drinking. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5131.) Marble's death certificate lists her cause of death as cardiopulmonary arrest, septic shock, and pneumonia. (ECF No. 161, PageID.4627.)[5]

_____

[5] "When a court is presented with a 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Coll. Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). Michigan death records are part of the public record. *See* Mich. Comp. Laws § 33.2882(1)(c) ("the state registrar or local registrar shall issue the appropriate 1 of the following. . . [a] certified copy of a death record, including the cause of death, to any applicant."). Although not referenced in the complaint, Bertie Marble's death certificate is central to the

Legionnaires' disease manifests in similar ways to other types of pneumonia. The mortality rate for Legionnaires' disease is 20% when properly diagnosed, but if left untreated, it rises to 80%. (ECF No. 143-1, PageID.3225.) Plaintiffs allege that if Bertie Marble had been properly diagnosed, her chance of death might have been more preventable. (*Id.*) Plaintiffs allege that McLaren employees believed a *legionella* infection was the cause of Bertie Marble's death but concealed it from her family. (*Id.* at PageID.3194–3195.) The complaint does not offer any specifics related to this cover-up, but generally states that after Bertie Marble died, McLaren employees "caused" her family not to seek an autopsy. (*Id.* at PageID.3195.) An autopsy, they contend, would have revealed that the true cause of Bertie Marble's death was Legionnaires' disease. (*Id.*)

*Conspiracy to Cover Up the Legionnaires' Disease Outbreak in Flint*

Plaintiffs allege there was a conspiracy between all Defendants to cover up the public health crisis posed by Flint's water. In particular,

allegations contained in the complaint. Her death certificate was attached to MDEQ Defendant's motion to dismiss and was explicitly referenced in Plaintiffs' response brief. (ECF No. 161-1); (ECF No. 176, PageID.5098.) Moreover, a death certificate is a public record. The Court can therefore consider this item and the cause of death information contained in it as undisputed evidence that McLaren determined Bertie Marble's cause of death to be cardiopulmonary arrest, septic shock, and pneumonia.

Plaintiffs allege that each Defendant knew there was a significant increase in illnesses caused by exposure to *legionella* bacteria and that the likely source of the increase was the introduction of Flint's river water as the drinking water source. (*Id.* at PageID.3201.) Plaintiffs allege that extensive studies of *legionella* have established that the pathogen enters the water supply when the "bio-film" protecting pipes is stripped away, which is what happened when the Flint River's corrosive water entered the City's pipes. (*Id.* at PageID.3225.)

Plaintiffs also allege that by October 2014, McLaren and the Government Defendants[6] knew there was an increase in reported cases of Legionnaires' disease in Genesee County beginning in May of 2014. (*Id.* at PageID.3197.) Sometime in January 2015, state officials met with McLaren representatives to discuss the public health threat from *legionella* bacteria. (*Id.* at PageID.3227.)[7] On January 27, 2015, McLaren

---

[6] This opinion will refer to the following Defendants or groups as the "Government Defendants": the State Defendants, MDEQ Defendants, City Defendants, and Jeff Wright.

[7] According to the *Walters* Master Complaint, in January 2015, staff from Genesee County hospitals, MDHHS, MDEQ, and Genesee County Health Department ("GCHD") met, and MDHHS Director Nick Lyon directed GCHD to conduct and complete its evaluation of the causes of the increased Legionnaires' disease cases that had begun to occur in 2014. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5088.)

and the City of Flint were placed on notice by the Genesee County Health Department that there was an association between the outbreak of Legionnaires' disease and the commencement of the use of Flint River water. (*Id.* at PageID.3228.) Plaintiffs also allege that Governor Snyder and Defendants Wells and Lyon at MDHHS were aware of the outbreak of Legionnaires' disease for three months before January 2015, but did nothing to inform the public or address the problem. (*Id.* at PageID.3227.)

Plaintiffs allege that the Government Defendants all "agreed and conspired amongst themselves to cover up evidence that exposure to the Flint River water was the likely cause for the sharp increase in reported deaths and injuries stemming, among other things, from exposure to the *legionella* bacteria." (*Id.* at PageID.3214–PageID.3215.) Plaintiffs further allege that the McLaren, VNA, and LAN Defendants conspired with government officials to conceal the consequences of switching Flint's water supply to the Flint River and worked with the government to conceal the risks of *legionella* emanating from Flint's water. (*Id.* at PageID.3201–3203.) In total, at least 87 individuals exposed to Flint River water contracted Legionnaires' disease and at least 14 have died. (*Id.* at PageID.3231.)

## C.   Prior Flint Water Cases

The Flint Water Cases have already produced several Sixth Circuit opinions. These are binding on this Court and include *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019); *Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017); and *Mays v. City of Flint*, 871 F.3d 437 (6th Cir. 2017). The Court will also adhere to its own prior decisions where appropriate, including *Guertin v. Michigan*, No. 16-12412, 2017 WL 2418007 (E.D. Mich. June 5, 2017); *Carthan v. Snyder*, 329 F. Supp. 3d 369 (E.D. Mich. 2018); *Carthan v. Snyder*, 384 F. Supp. 3d 802 (E.D. Mich. 2019); and *Walters v. City of Flint*, No. 17-10164, 2019 WL 3530874 (E.D. Mich. Aug. 2, 2019).

## III.   Standard of Review

When deciding a motion to dismiss under Federal Rule of Procedure 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.,* 684 F.3d 605, 608 (6th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 570 (2007)). A plaintiff's claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

## IV. Threshold Issues

### A. State Actor

*Marble* Plaintiffs bring several claims under 42 U.S.C. § 1983 against Defendants McLaren, VNA, and LAN. In order to state a claim under § 1983, a defendant must act under the color of state law, and these Defendants are not state officials. But private parties can act under color of state law if their conduct is "fairly attributable to the state." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Plaintiffs set forth several theories to argue that these private defendants acted under the color of state law, but none are successful.

*Legal Standard*

The Sixth Circuit recognizes four tests to determine whether private conduct is attributable to the state: "(1) the public function test; (2) the state compulsion test; (3) the symbiotic relationship or nexus test; and (4) the entwinement test." *Marie v. Am. Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014). The public function test applies when a private business performs state operations, such as running an election. *Ellison v. Garbarino*, 48 F.3d 192, 195 (6th Cir. 1995). The state compulsion test looks for whether "the state significantly encouraged or somehow coerced the private party . . . to take a particular action." *Id.* The nexus test "requires a sufficiently close relationship (i.e. through state regulation or contract) between the state and the private actor" such that the private actor's actions can be attributed to the state. *Id.* Finally, the entwinement test asks whether the private entity is involved with governmental policy-setting or the government is entwined in a private entity's management. *Marie*, 771 F.3d at 363.

Plaintiffs argue that all three Defendants are liable under the nexus test for conspiring with other state actors to violate their civil rights. Plaintiffs further argue that VNA and LAN are state actors under

the public function test, the state compulsion test, and the nexus test for a reason apart from the alleged conspiracy.

### i. Nexus Test

Under the nexus test, "the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). In order to meet this burden, a plaintiff must show "that the state is intimately involved in the challenged private conduct." *Id.*

Plaintiffs advance two arguments under the nexus test: (1) that there is a sufficiently close nexus between the Government Defendants and the private actors because they were all involved in a civil conspiracy, and (2) that VNA and LAN had governmental authority under their contracts with the City of Flint. (ECF No. 176, PageID.5062–6066.)

### a. Conspiracy between all Defendants

The Sixth Circuit has held that if a private party conspires with state officials to violate a plaintiff's constitutional rights, that party can qualify as a state actor under § 1983. *Cooper v. Parrish*, 203 F.3d 937,

952 (6th Cir. 2000). To state a claim for civil conspiracy, Plaintiffs must demonstrate that (1) Defendants entered into an agreement to violate Plaintiffs' rights; (2) Defendants shared a general objective to deprive the Plaintiffs of their rights; and (3) an overt act was committed in furtherance of the conspiracy to deprive Plaintiffs of their civil rights. *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (citing *Hooks v. Hooks,* 771 F.2d 935, 943–44 (6th Cir.1985)). It is "well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." *Id.* (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)). Therefore, Plaintiffs must plead enough facts to support a reasonable inference that the elements of a conspiracy are satisfied. *Boxill v. O'Grady*, 935 F.3d 510, 519 (6th Cir. 2019).

Plaintiffs' conspiracy allegations are broad and conclusory and therefore do not meet the Sixth Circuit's pleading requirement to adequately allege a conspiracy. *Spadafore*, 330 F.3d at 854. From what the Court can surmise of the complaint and from oral argument, the alleged conspiracy here is that all Defendants agreed not to inform the

public of the threat of Legionnaires' disease being contracted from the Flint water supply. (ECF No. 143-1, PageID.3228.) Evidence of the conspiracy, Plaintiffs contend, "is powerfully attested and evidenced by the mutual silence amongst all the Defendants" who knew "of the lethal danger of *legionella*" and knew that "none of them would breach that silence and thereby betray their common conspiratorial objective." (ECF No. 143-1, PageID.3215.)

As for McLaren, Plaintiffs also point to the following allegations in their response brief, which they argue are sufficient to show that McLaren was a state actor by way of conspiracy:

> McLaren agreed it would not disclose the presence of *legionella* at the hospital, either publicly or to its patients, so as to continue the concealment of *legionella* bacteria in the Flint River water and, thereby, cover up the wrongs that the Government Defendants had inflicted . . . McLaren conspired with Government Defendants to conceal the highly increased potential for deadly *legionella* in Flint public water, after April 2014 . . . McLaren agreed that it would conceal the outbreak of Legionnaires from the public and from its patients including Bertie Marble and her family, although McLaren, acting through its agents and employees knew that Ms. Marble had acquired a *legionella* infection while a patient at McLaren and had subsequently died of it while a patient there.

(ECF No. 176, PageID.5095–5096.) (internal citations and quotations omitted). As for LAN and VNA, Plaintiffs also identify the overall contracting work that the companies performed for the City of Flint throughout the years to argue that they were part of a conspiracy to give assurances to Flint residents and businesses that their water was safe to drink.

These vague references to co-conspiratorial actors and aims do not meet the pleading requirements for a conspiracy. The Sixth Circuit dismissed § 1983 conspiracy claims for similar reasons in *Tahfs v. Proctor*, 316 F.3d 584 (6th Cir. 2003). In *Tahfs*, the court found the plaintiff's conspiracy allegations vague because the plaintiff designated an entire group of people as part of a conspiracy without specifying individual actions. *Id.* at 592 ("Most significantly, Tahfs never identifies the state court actors with whom the [defendants] allegedly conspired, other than to designate them as Wayne County Circuit Court staff members.") The Sixth Circuit went on to say, "[i]t is clear that, even with discovery, [the plaintiff] could not identify these supposedly corrupt individuals because nowhere in her complaint can she identify *behavior*, as opposed to *outcomes*, suggesting corruption." *Id.*

The conspiracy allegations in this case are similarly vague and nonspecific. The generalized references to "public official Defendants" and "Government Defendants" make it impossible for the Court to evaluate the alleged conduct of any individual defendant. Plaintiffs identify no single person at VNA, LAN, or McLaren who took any overt actions in furtherance of a conspiracy. They simply make the kinds of allegations that the law forbids: vague and conclusory.

The pleadings here are also similar to a recent Sixth Circuit case, *Boxill v. O'Grady*, 935 F.3d 510 (6th Cir. 2019), in which the court found the pleadings deficient. In *Boxill*, the plaintiff's conspiracy claims fell short because her complaint offered "no facts relevant to the individual liability" of the defendants. *Id.* at 519. For example, the plaintiff alleged that "the Defendants formulated a concealed plan and policy that female . . . employees asserting complaints about abusive and discriminatory treatment at the hands of Judges would be discouraged and intimidated into silence." *Id.* But the Sixth Circuit found that the plaintiff did not state any plausible, non-conclusory facts to demonstrate that the defendants joined the alleged conspiracy, shared in the conspiratorial objective, or committed acts in furtherance of the conspiracy. *Id.*

Similarly here, Plaintiffs identify no particular person at VNA, LAN, or McLaren who entered into a plan or took an overt act in furtherance of the conspiracy to hide the *legionella* outbreak.

What Plaintiffs set forth here is no more than parallel conduct among several Defendants. In *Twombly*, a key Supreme Court cases that defines the sufficiency of pleadings for a Rule 12(b)(6) motion, the Court dismissed allegations of conspiracy in an antitrust case because, "without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007). Like in *Twombly*, what is alleged here is parallel conduct of remaining silent about a *legionella* outbreak. Plaintiffs' allegations include no plausible, nonconclusory facts to show that VNA, LAN, or McLaren were involved in a conspiracy with any particular Government Defendant or Defendants. These private Defendants are not state actors under the nexus test.

### b. Contractual Relationship with LAN and VNA

Alternatively, Plaintiffs argue that LAN and VNA are state actors under the nexus test for having a sufficiently close relationship with the

Government Defendants. The Sixth Circuit holds that for the nexus test, a party must show that "the state is intimately involved in the challenged private conduct in order for that conduct to be attributed to the state for purposes of section 1983." *Wolotsky*, 960 F.2d at 1335 (citing *Bier v. Fleming*, 717 F.2d 308, 311 (6th Cir.1983)). This test is a necessarily fact-bound inquiry. *Lansing v. City of Memphis*, 202 F.3d 821, 830 (6th Cir. 2000).

Separate from the conspiracy alleged above, Plaintiffs also contend there was a sufficiently close nexus between LAN, VNA, and the Government Defendants because of the contracts between these companies and the City of Flint to evaluate the Flint River as a source of drinking water. (ECF No. 176, PageID.5064–5066.) The Sixth Circuit has made clear that a one-time contract for professional services does not provide a sufficient nexus for § 1983 claims. *S.H.A.R.K. v. Metro Parks Serving Summit Cty.*, 499 F.3d 553, 565 (6th Cir. 2007). In *Metro Parks*, the Sixth Circuit found that there was not a sufficient nexus between "two separate entities entering into a contractual arrangement to provide and receive a one-time service." *Id.* Plaintiffs only allege facts to show that VNA had a one-time contract with the City of Flint. (*Walters*, No.

17-cv-10164, ECF No. 185-2, PageID.5136–5141.) *Metro Parks* is dispositive as to VNA.

Unlike VNA, LAN was involved in a longer contractual relationship than a "one-time service" with Government Defendants. The City of Flint commissioned LAN in 2011 to conduct a study on the safety of the Flint River as a source of drinking water, (*Id.* at PageID.5118) and then again in 2013 to advise the City with respect to using the Flint River water. (*Id.* at 5122.) Still, all that Plaintiffs allege in their Complaint is that LAN had a contract with the City of Flint. Plaintiffs argue that LAN was "cloaked with government [sic] authority" (ECF No. 176, PageID.5065), but the facts as alleged only show a contractual relationship between the two entities. The Complaint does not show a "'pervasive entwinement,' between the private actor and the state." *Metro Parks*, 499 F.3d at 565 (quoting *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 291 (2001)). Just as the Supreme Court said in *Rendell-Baker v. Kohn*, many businesses depend on contracts to build "roads, bridges, dams, ships, or submarines" for the government and "[a]cts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public

contracts." 457 U.S. 830, 840–41 (1982). Accordingly, Plaintiffs have not adequately alleged that VNA or LAN are state actors under the nexus theory.

### ii. Public Function

Plaintiffs also allege that VNA and LAN are state actors under the public function test. For purposes of the "public function" test, a private party acts under color of state law if the private party "exercise[s] powers which are traditionally exclusively reserved to the state." *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007) (internal quotation marks omitted). Plaintiffs contend that VNA Defendants "deliberately implemented and approved a plan to use Flint River water as public water, notwithstanding its known dangerous and potentially life-threatening qualities" and in so doing these Defendants "acted in a public capacity and, therefore, under color of law." (ECF No. 143-1, PageID.3220–3221.) Plaintiffs allege that LAN worked together with the government and "deliberately placed the Flint Water Treatment Plant in operation while understanding the inherent dangers of doing so." (*Id.* at PageID.3219.)

The duty to provide safe water is not an exclusive state function. Plaintiffs argue that because Michigan law imposes an obligation on water suppliers to meet the state's water standards, this is an "exclusive state function." (ECF No. 176, PageID.5068.) But the law Plaintiffs cite imposes a duty to ensure compliance on any "supplier of water," Mich. Comp. Laws § 325.1019, and such suppliers can include private corporations. § 325.1002(t), (m). Moreover, the VNA Defendants did not become involved with the Flint Water Crisis until February 2015, which was after the switch to the Flint River as a primary water source. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5137.)

The Supreme Court rejected a similar argument in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974). In *Jackson*, the Supreme Court held that the termination of a plaintiff's electric service by a privately owned, heavily regulated utility company was not state action. *Id.* at 358–59. This holding was despite the utility's partial monopoly in the state and a state agency's approval of the utility's termination procedure. *Id.* at 356–57. The Supreme Court refused to create "a broad principle that all businesses 'affected with the public interest' are state actors in all their actions." *Id.* at 353.

Plaintiffs have not adequately alleged that VNA or LAN exercised powers traditionally and exclusively reserved to the state. Therefore, VNA and LAN are not state actors under the public function test.

### iii.    State Compulsion Theory

A private entity can be considered a state actor if its actions were "coerced" by a government official. *Wilcher v. City of Akron*, 498 F.3d 516, 520 (6th Cir. 2007). Plaintiffs' complaint includes no allegations that government officials coerced VNA and LAN to violate Plaintiffs' rights. Plaintiffs' response brief offers three pages of conjecture without any reference to factual allegations in their Complaint to argue that the state compulsion theory applies. (ECF No. 176, PageID.5066–68.) Therefore, Plaintiffs' pleadings are insufficient to show that VNA and LAN Defendants are state actors under the state compulsion test.

## Conclusion

Plaintiffs' complaint does not allege facts to show that McLaren, LAN, or VNA are state actors for any purposes under 42 U.S.C. § 1983. Plaintiffs' counts under §1983 are dismissed as to these private Defendants.

### B.    Immunity

*Sovereign Immunity*. Governor Snyder moves to dismiss on the basis of sovereign immunity.[8] Governor Snyder argues that sovereign immunity deprives the Court of jurisdiction to hear claims for injunctive relief against him in his official capacity. At oral argument, Plaintiffs stipulated that Governor Snyder is entitled to sovereign immunity. Therefore, claims against Governor Snyder in his official capacity are dismissed.

*Qualified Immunity*. The State, MDEQ, and City Defendants argue that they should be granted qualified immunity regardless of whether Plaintiffs have stated a valid bodily integrity claim against them. (ECF No. 155, PageID.3356–3360); (ECF No. 158, PageID.4460); (ECF No. 161, PageID.4652–4657.) The Court considered and rejected substantially similar arguments in *Walters*. 2019 WL 3530874, at *19. Because the right to bodily integrity is clearly established, Defendants cannot rely on qualified immunity if Plaintiffs state a valid claim against them.

## V. Analysis

### A. State-Created Danger

---

[8] As a challenge to the Court's subject matter jurisdiction, Governor Snyder's motion is brought pursuant to Federal Rule of Civil Procedure 12(b)(1).

Plaintiffs allege that the Government, LAN, and VNA Defendants violated their right to be free from a state-created danger.[9] (ECF No. 143, PageID.3191; ECF No. 143-1, PageID.3231–PageID.3234.) All Defendants moved to dismiss. (ECF No. 149, PageID.3288–3289); (ECF No. 155, PageID.3361–3363); (ECF No. 156, PageID.3919–3920); (ECF No. 157-1, PageID.3950); (ECF No. 158, PageID.4447–4448); (ECF No. 159, PageID.4500); (ECF No. 160, PageID.4595–4596); (ECF No. 161, PageID.4678); (ECF No. 164, PageID.4994–4995.)

In *Carthan* this Court set forth the elements of a state-created danger claim:

> [T]he individual must show: (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

---

[9] In their Short Form Complaint, Plaintiffs include a "state crested [sic] danger" claim against McLaren (ECF No. 143, PageID.3191), but do not mention or include any allegations against McLaren in their Addendum's Count I for state-created danger. (ECF No. 143-1, PageID.3231.) Plaintiffs response brief indicates they intended to bring this claim against McLaren. (ECF No. 176, PageID.5080.) The claim is dismissed against McLaren for being no more than a bare assertion lacking "further factual enhancement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

384 F. Supp. 3d at 862 (quoting *Carthan*, 329 F. Supp. 3d at 392). There, the Court held that the *Carthan* plaintiffs did not allege facts to show elements one or two. As to element one, the *Carthan* plaintiffs failed to allege that the state had increased the risk that they would be exposed to an act of violence committed by a third party. *Id.* at 862–64. As to element two, the complaint failed to identify a special danger to the plaintiffs in particular. *Id.* at 864–65. The Court later reached the same result on the same facts alleged by plaintiffs in *Walters*. 2019 WL 3530874, at \*32–\*35.

The *Marble* Plaintiffs fare no better here than the plaintiffs did in *Carthan* and *Walters*. Their complaint is materially similar to that of *Carthan* and *Walters* on the state-created danger counts—only a few words differ between the complaints. (*Compare* ECF No. 143-1, PageID.3231–3234 *with Carthan v. Snyder*, No. 16-cv-10444, ECF No. 620-3, PageID.18006–18008 *and Walters v. Flint*, No. 17-cv-10164, ECF No. 185-2, PageID.5208–5211.) The main difference between the complaints is that the *Marble* Plaintiffs seek to bring this claim against VNA, LAN, and McLaren under 42 U.S.C. § 1983, arguing that they are state actors. As set forth below, Plaintiffs' state-created danger claim is

dismissed for (1) failure to allege facts to show that the state increased the risk that Plaintiffs would be exposed to an act of violence committed by a third party, and (2) failure to identify a special danger to Plaintiffs in particular.

*Third Party Requirement*

Just as in *Carthan,* the complaint here fails to allege that the state increased a risk that Plaintiffs would be exposed to an act of violence committed by a third party. 384 F. Supp. 3d at 862–64. Specifically, the *Carthan* complaint did not identify any third party as required to plead a state-created danger claim. *Id.* at 862.

Similarly here, the *Marble* complaint does not identify a third party under their state-created danger count. *Marble* Plaintiffs' response brief seems to argue that VNA, LAN, and McLaren Defendants are the third parties otherwise missing from *Carthan.* (ECF No. 176, PageID.5080.) Yet Plaintiffs sue these Defendants under § 1983 as state actors, liable together with the state for the alleged state-created danger.

Moreover, the purpose of the state-created danger theory is to provide an avenue for liability where state actors are responsible for acts or omissions causing harm but would otherwise escape liability. The

theory is an exception to the general rule that a state's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause. *See DeShaney v. Winnebago Cnty. Dept' of Soc. Servs.*, 489 U.S. 189, 197 (1989); *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 464 (6th Cir. 2006) (discussing the state-created danger theory as an exception to the general rule). But drawing on the same material facts alleged in this state-created danger count, Plaintiffs successfully state a claim for a violation of bodily integrity against many of the Government Defendants. *See infra* Section V.B.

In their response brief, Plaintiffs cite to a recent case in the District of Massachusetts to support the contention that Defendants created a risk of harm in the ways contemplated by a state-created danger claim. (ECF No. 176, PageID.5081) (citing *Hootstein v. Amherst-Pelham Reg'l Sch. Comm.*, 361 F. Supp. 3d 94 (D. Mass. 2019)). But *Hootstein* cuts directly against Plaintiffs' argument. In *Hootstein*, the plaintiff alleged state-created danger because lead contaminated water was provided to students and parents despite a school knowing of high lead levels. 361 F. Supp. 3d at 99–101. The court said that the state-created danger theory "clearly does not apply under these facts" because the defendant "directly

caused the harm by falsely claiming, after high levels of lead were discovered in school drinking water, that the water was nevertheless safe to drink." *Id.* at 110. The court went on to explain why these facts instead supported a claim for bodily integrity. *Id.* at 111. (citing *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019)) ("[T]o the extent Plaintiff seeks to invoke the state-created danger exception, his allegations present a mismatch with this theory. Rather, Plaintiff's allegations are more properly analyzed as a direct substantive due process claim for violation of his right to bodily integrity.") (footnotes omitted). Much like in *Hootstein*, Plaintiffs' facts as alleged are more properly analyzed under a claim for a violation of the right to bodily integrity.

*Special Danger to Plaintiffs*

The *Marble* complaint additionally fails to identify a special danger to Plaintiffs in particular. In *Carthan* the Court stated:

> Even if the Court could determine that the third-party harm requirement of plaintiffs' state-created danger claim had been met, such a claim will stand only where "the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims." *Reynolds*, 438 F.3d at 696. The state-created danger must be a "special danger" to a "discrete class of individuals." *Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005). It is not sufficient for the purposes of this claim if the specific danger

is "no more a danger to [the plaintiff] than to any other citizen on the City streets." *Jones v. City of Carlisle*, 3 F.3d 945, 949–50 (6th Cir. 1993). The danger may not be one that "affects the public at large." *Kallstrom*, 136 F.3d at 1066.

384 F. Supp. 3d at 864. In their complaint, the *Marble* Plaintiffs allege that the discrete group is "those persons who live in the City of Flint or who happen to use Flint Water." (ECF No. 143-1, PageID.3233.) This argument fails just as it did in *Carthan* where Plaintiffs argued that the "entire population of Flint constitutes a discrete class of individuals." 384 F. Supp. 3d at 864.

In Plaintiffs' response brief, and contrary to what is alleged in their complaint, they argue that the discrete group of individuals harmed was the patients admitted to McLaren after the *legionella* outbreak. (ECF No. 176, PageID.5083.) Even if the Court were to construe Plaintiffs' new allegations as a motion to amend their complaint under Federal Rule of Civil Procedure 15(a), these allegations would still fail to constitute a discrete group. *See JAT, Inc. v. National City Bank of Midwest*, 460 F. Supp.2d 812, 818 (E.D. Mich. 2006) (allowing an "implicit motion to amend" where plaintiffs did not add a new cause of action, but merely

provided additional support to their initial pleading). As this Court explained in *Carthan*:

> The largest groups the Sixth Circuit has determined were able to pursue a state-created danger claim were in *Kallstrom*, where a city's release of private information from the personnel files of three undercover officers "placed the personal safety of the officers and their family members, as distinguished from the public at large, in serious jeopardy," 136 F.3d at 1067, and in *McQueen*, where the risk of a shooter in a school posed a risk to the five students in the room with him and even those in the school building, but all those outside the school building constituted "the general public." 433 F.3d at 468.

384 F. Supp. 3d at 865 (internal citations omitted). Here, the group would be much more like "the general public," as the timeframe would cover all patients admitted to McLaren for several months. There are no cases to support this kind of broad definition of "discrete group," and this Court cannot expand the state-created danger doctrine to cover potentially hundreds of individuals.

For the reasons stated above, and set forth more fully in *Carthan*, 384 F. Supp. 3d at 862–65 and *Walters*, 2019 WL 3530874, at *32–*35, Plaintiffs fail to satisfy two necessary elements for a state-created danger claim. Defendants' motions to dismiss this count are granted.

## B. Bodily Integrity

Plaintiffs adopted the bodily integrity claim from the Master Complaint in *Walters* and similarly bring this claim against all Government Defendants. (ECF No. 73, PageID.331–332, 334); (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5211–5213); (ECF No. 158, PageID.4447–4448.) Defendants all move to dismiss. (ECF No. 149, PageID.3276); (ECF No. 155, PageID.3364–3373); (ECF No. 159, PageID.4477–4478); (ECF No. 160, PageID.4583); (ECF No. 161, PageID.4657–4666.) Because Plaintiffs have alleged no additional facts beyond those set out in the Master Complaint, the bodily integrity claims against the following Defendants are dismissed for the same reasons they were dismissed in *Walters*: Lyon, Wyant, Wright, and Walling. 2019 WL 3530874, at *16–*17, *36, *38–*39. Each of the remaining Defendants will be addressed below.

The Court has addressed the right to bodily integrity on several prior occasions. Recently in *Carthan* and *Walters* the Court set forth the governing legal standard for such a claim:

> The right to bodily integrity is a fundamental interest protected by the Due Process Clause of the Fourteenth Amendment. *Guertin*, 912 F.3d at 918–19; *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *63 (citing *Union Pac. Ry. Co. v.*

*Botsford*, 141 U.S. 250, 251 (1891)). And although violations of the right to bodily integrity usually arise in the context of physical punishment, the scope of the right is not limited to that context. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062–63 (6th Cir. 1998). For instance, the "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Guertin*, 912 F.3d at 919 (citing *Washington v. Harper*, 494 U.S. 210, 229 (1990)). And "compulsory treatment with anti-psychotic drugs may [also] invade a patient's interest in bodily integrity." *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *66 (citing *Lojuk v. Quandt*, 706 F.2d 1456, 1465–66 (7th Cir. 1983)). The key is whether the intrusion is consensual. *See Guertin*, 912 F.3d at 920. There is no difference between the forced invasion of a person's body and misleading that person into consuming a substance involuntarily. *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *71 (citing *Heinrich v. Sweet*, 62 F. Supp. 2d 282, 313–14 (D. Mass. 1999)). As such, officials can violate an individual's bodily integrity by introducing life-threatening substances into that person's body without their consent. *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *65 (citing *Washington*, 494 U.S. at 229).

However, to state a claim, plaintiffs must do more than point to the violation of a protected interest; they must also demonstrate that it was infringed arbitrarily. *Guertin*, 912 F.3d at 922. *But see Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (observing that in some contexts government action may violate substantive due process without a liberty interest at stake). And with executive action, as here, only the most egregious conduct can be classified as unconstitutionally arbitrary. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In legal terms, the conduct must "shock[ ] the

conscience." *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *63 (quoting Lewis, 523 U.S. at 846).

Whether government action shocks the conscience depends on the situation. *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002). Where unforeseen circumstances demand the immediate judgment of an executive official, liability turns on whether decisions were made "maliciously and sadistically for the very purpose of causing harm." *Lewis*, 523 U.S. at 852–53 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). But where an executive official has time for deliberation before acting, conduct taken with "deliberate indifference" to the rights of others "shocks the conscience." *See Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000). This case involves the latter of these two situations. And as a result, plaintiffs must demonstrate that (1) officials knew of facts from which they could infer a "substantial risk of serious harm," (2) that they did infer it, and (3) that they nonetheless acted with indifference, *Range*, 763 F.3d at 591 (citing *Ewolski*, 287 F.3d at 513), demonstrating a callous disregard towards the rights of those affected, *Guertin*, 912 F.3d at 924 (quoting *Schroder v. City of Fort Thomas*, 412 F.3d 724, 730 (6th Cir. 2005)).

*Walters*, 2019 WL 3530874, at *14–*15 (citing *Carthan*, 384 F. Supp. 3d at 839–40). The same legal standard applies here.

The main difference between *Carthan* and *Walters* and this case is that Plaintiffs do not allege injuries from lead exposure. Instead, Plaintiffs allege that Marble's death was caused by the *legionella* bacteria from the City of Flint's water supply.

The fact that Bertie Marble did not suffer lead poisoning but rather died from Legionnaires' disease does not change the core of this Court's prior bodily integrity analysis. Plaintiffs plausibly allege the connection between *legionella* bacteria and the Flint Water Crisis—contending that *legionella* was responsible for at least nine deaths and 87 infections. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5155.) Plaintiffs claim that "[e]xtensive studies of *[l]egionella* have established that the pathogen enters the water supply when the 'bio-film' protecting pipes is stripped away, which is exactly what happened when the River's corrosive water entered the City's pipes." (*Id.* at PageID.5131.) Further, Plaintiffs contend that outbreaks of Legionnaires' disease are rare unless pipes are stripped of their "bio-film" by corrosive water. (*Id.* at PageID.5144.) The State Defendants contest the connection between the Flint Water Crisis and the 2014-2015 *legionella* outbreak, arguing that the source of the bacteria was from McLaren Hospital. (ECF No. 155, PageID.3336–3337.) But for a motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.,* 684 F.3d 605, 608 (6th Cir. 2012). Plaintiffs have plausibly alleged the connection between

the switch to Flint River water and the Legionnaires' disease outbreak in Flint.

The State and MDEQ Defendants argue that the Court should decide these *legionella*-related cases differently from lead injury cases. (ECF No. 155, PageID.3364–3373); (ECF No. 161, PageID.4663–4666.) Yet as the Court said in *Carthan*, "[t]his is not a case about the right to a contaminant-free environment or clean water. Rather, this case implicates the consumption of life-threatening substances. Indeed, neither side disagrees that lead and *legionella* are life threatening, nor that plaintiffs ingested these contaminants and others through the water supply." 384 F. Supp. 3d at 840 (internal citations removed). Similarly, as the Sixth Circuit held in *Guertin*, a related Flint Water Case: "Involuntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value—often under false pretenses and with deceptive practices hiding the nature of the interference—is a classic example of invading the core of the bodily integrity protection." *Guertin v. State*, 912 F.3d 907, 920–21 (6th Cir. 2019). Plaintiffs plausibly allege that the presence of *legionella* bacteria in Flint was a foreseeable result of the April 2014 switch to Flint River

water. Because Defendants allegedly hid the fact that Flint's water contained life-threatening substances like lead and *legionella*, and because under state and municipal law, McLaren—a City of Flint business where Bertie Marble was hospitalized—was not permitted to receive water in any other way, Flint Code of Ord. §§ 46-25, 46-26, 46-50(b), Plaintiffs' claim implicates the right to bodily integrity. *See Walters*, 2019 WL 3530874, at *15.

In *Guertin*, the Sixth Circuit also found *Cincinnati Radiation Litigation* "especially analogous" to circumstances surrounding the Flint Water Crisis. *Guertin v. State*, 912 F.3d 907, 921 (6th Cir. 2019) (citing *In re Cincinnati Radiation Litigation*, 874 F. Supp. 796 (S.D. Ohio 1995)). In *Cincinnati Radiation*, government officials subjected cancer patients to radiation doses consistent with those expected to be inflicted upon military personnel during a nuclear war. 874 F. Supp. at 802–04. The government actors never disclosed the risks or obtained consent to irradiate patients at those levels for those purposes—they instead told the patients that the radiation was treatment for their cancer. *Id.* at 803–04. The *Cincinnati Radiation* court concluded that "[t]he right to be free of state-sponsored invasion of a person's bodily integrity is protected by

the Fourteenth Amendment guarantee of due process." *Id.* at 810–11. The Sixth Circuit compared *Cincinnati Radiation* to the Flint Water case before it, finding that "[i]n both instances, individuals engaged in voluntary actions that they believed would sustain life, and instead received substances detrimental to their health." 912 F.3d at 921. *Legionella* bacteria—or any similar life-threatening substance— resulting from Flint River water being channeled through a known, ill-equipped water treatment plant should be considered no different from lead.

The right to bodily integrity is not dependent upon which particular dangerous or lethal substance came from Flint's pipes. Defendants made a choice to utilize the long dormant Flint Water Treatment Plant ("FWTP"), knowing that the plant required millions of dollars in upgrades before it could process the raw water from the Flint River, and knowing that those upgrades would not be implemented. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5214.) Defendants might not have known whether lead or *legionella* were going to result from this switch, but that does not change the involuntary and harmful nature of the intrusion Flint Water users experienced.

Because Plaintiffs plausibly allege that involuntary exposure to *legionella* stemming from the Flint Water Crisis implicates the right to bodily integrity, the Court now turns to each individual Defendant to determine whether they (1) knew of facts from which they could infer a substantial risk of serious harm, (2) did infer it, and (3) nonetheless acted with indifference, demonstrating a callous disregard towards the rights of those affected.

Plaintiffs rely on the factual allegations from the *Walters* Master Complaint. But in *Walters*, the Court relied upon many facts that happened after Bertie Marble's death that cannot be considered here. Therefore, the Court must determine whether there are enough facts alleged against each Defendant before March of 2015 to show a callous disregard for Bertie Marble's bodily integrity.

### i. State Defendants

Plaintiffs state a bodily integrity claim against Governor Snyder but do not state a claim against former Treasurer Andy Dillon.

*Governor Snyder*

Plaintiffs state a bodily integrity claim against Governor Snyder. They allege facts sufficient to meet the first and second element of a

bodily integrity claim. Plaintiffs plausibly allege that Governor Snyder knew of and did infer a substantial risk of serious harm to Flint water users. He knew that the use of "Flint River water as a primary drinking source had been professionally evaluated and rejected as dangerous and unsafe" in 2011. (*Id.* at PageID.5077.) He also knew that under the plan to create the Karegnondi Water Authority, Flint River water would be used as an interim source of water for the City of Flint. (*Id.*) Plaintiffs also allege that shortly after the switch to Flint River water, the Governor's office began receiving complaints about the water. (*Id.* at PageID.5085.) There were also numerous press stories about water quality problems in Flint as early as May 2014. (*Id.*) By June of 2014, "[m]any Flint water users reported that the water was making them ill" and in October 2014, "Flint's public health emergency was a topic of significant discussion in the Governor's office." (*Id.*) Similarly, in October of 2014, the Governor's office was on notice that General Motors stopped using Flint River water because it was corroding their machinery. (*Id.* at 5086.) Shortly after GM stopped using the water, even a member of Governor Snyder's staff, his Chief Legal Counsel, called the use of the Flint River as the drinking water source for the population of Flint

"downright scary." (*Id.* at PageID.5087.) Plaintiffs also allege that in January 2015, the Governor met with other government officials to discuss the ongoing threat to public health posed by *legionella* bacteria in the Flint River water. (*Id.* at 5088.) Accordingly, Plaintiffs have plausibly alleged the first two elements of a bodily integrity claim.

As for the third element of a bodily integrity claim, in *Walters*, this Court relied on Governor Snyder's actions after March of 2015 to find deliberate indifference, but that analysis is inapplicable here. *See Walters*, 2019 WL 3530874, at *15–*16 (citing *Carthan*, 384 F. Supp. 3d at 841–42). The challenge here is deciding whether, when disregarding all of the Governor's actions after March 2015, the Plaintiffs can adequately allege deliberate indifference.

As for facts showing Governor Snyder's callous disregard, it may be enough that he authorized the switch to the Flint River,[10] knowing that "there was no agreed upon plan in place to implement the necessary remediation at the FWTP in order to use Flint River water as Flint's sole source of water." (*Walters*, No. 17-cv-10164, ECF No. 185-2,

_____

[10] Plaintiffs also adequately allege that Governor Snyder had authority over the decision to switch to Flint River water. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5075–5078.)

PageID.5077.) But certainly the Governor's continued inaction following the switch reinforces his deliberate indifference. The complaint alleges that by the end of January 2015, the Governor's office was fully aware of the public health emergency caused by the *legionella* bacteria and "launched a cover-up of the public health crisis." (*Id.* at PageID.5090.) The fact that the Governor authorized the switch to the Flint River knowing it was dangerous, and then did nothing for months despite ample notice of the harm Flint residents were experiencing states a claim of deliberate indifference.

*Andy Dillon*

Plaintiffs do not successfully state a bodily integrity claim against Dillon. The Court has reconsidered the allegations against Dillon in *Carthan* and *Walters* and now decides that they are not adequate to state a bodily integrity claim against him. In *Walters*, the Court found that the Master Complaint—also used in this case—contained much the same allegations in *Carthan* where it found:

> [Dillon] allegedly knew that the Flint River had been rejected as a water source as recently as 2011, and that the FWTP would require substantial improvements to safely process the river's water. From this, it is reasonable to believe that Dillon was aware of the risks associated with using the Flint River

as a water source. Yet despite this knowledge, Dillon helped to develop an interim plan that saw Flint transition to the Flint River. And importantly, he rejected a final bid from DWSD that could have obviated the need to use water from the Flint River until the FWTP had the capacity to treat it safely. This demonstrated an indifference to the risk of serious harm plaintiffs faced, made all the more inexplicable given that he knew DWSD presented the most cost effective mid-term option.

384 F. Supp. 3d at 858; 2019 WL 3530874, at *35.

But Plaintiffs have not sufficiently alleged that Dillon had any authority over the switch to using Flint River water in April 2014. Records show that Dillon was not Treasurer of the State of Michigan at the relevant time of the switch to Flint River water,[11] and Plaintiffs do not allege that Dillon held any other governmental authority over the

---

[11] Plaintiffs do not mention in their complaint that Andy Dillon stepped down as Treasurer before the transition to Flint River water. In a motion to dismiss, however, the Court is allowed to consider matters of public record. *Bassett v. Nat'l Coll. Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). According to the State Treasury Annual Reports, Dillon is listed as the Treasurer for fiscal year 2011-2012, but not for fiscal year 2012-2013. *Compare* Annual Report of the Michigan State Treasurer: Fiscal Year 2012-2013, https://www.michigan.gov/documents/treasury/STAR_2012-2013_Final_453641_7.pdf *with* Annual Report of the Michigan State Treasurer: Fiscal Year 2011-2012, https://www.michigan.gov/documents/treasury/STAR2011-2012_430334_7.pdf. Dillon was not Treasurer of Michigan during the April 2014 switch to the Flint River.

switch. Much like Emergency Manager Kurtz, Dillon was involved in developing the interim plan and both Kurtz and Dillon rejected the final bid from DWSD. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5172.) But the Court found that "[a]lthough Kurtz may have set in motion the chain of events that led to the transition to the Flint River, he resigned as Flint's Emergency Manager before the transition and therefore lacked control over the final decision." *Carthan*, 384 F. Supp. 3d at 861. Similarly, Dillon may have set in motion the chain of events that led to the transition to the Flint River, but he also lacked control over the final decision because he stepped down as Treasurer months before the transition. Plaintiffs do not allege any facts to show that Dillon made the final decision in April 2014, nor do they explain how Dillon had any power over the transition to Flint River water after he was no longer Treasurer for the State of Michigan.

## ii. MDEQ Defendants

Plaintiffs successfully state a claim against MDEQ Defendants Busch, Prysby, and Shekter Smith, but not against Defendant Cook. In *Carthan*, the Court found that plaintiffs stated a claim against each of

these MDEQ Defendants, but in this case the timing of Bertie Marble's death impacts liability for Cook.

The Sixth Circuit found, analyzing a substantially similar complaint in *Guertin*, that the MDEQ Defendants were "front and center during the crisis" and "played a pivotal role in authorizing Flint to use its ill-prepared water treatment plant to distribute drinking water from a river they knew was rife with public-health-compromising complications." *Guertin v. State*, 912 F.3d 907, 927 (6th Cir. 2019). First the Court will set out the prior reasoning from *Carthan* and then analyze the claim against these particular Defendants.

As for elements one and two of a bodily integrity claim, the Court found as follows in *Carthan*:

> It is reasonable to assume that they were aware of the substantial risk of harm plaintiffs faced. Before Flint's transition to the Flint River, Shekter-Smith and Busch knew of the risks associated with the Flint River. In addition, Busch . . . and Prysby recognized that the FWTP was not ready to begin operations. After the transition, Rosenthal learned that the FWTP was not practicing corrosion control, and he and Shekter-Smith both knew that no legitimate lead and copper testing was occurring. Moreover, Busch, Shekter-Smith, and Prysby also knew that the transition had created the conditions for *legionella* bacteria to flourish. Not to mention

the fact that the EPA and civic leaders were raising concerns about the quality of Flint's water.

384 F. Supp. 3d at 859. The *Walters* Master Complaint contains similar allegations as *Carthan*, but given that Bertie Marble's death was in March 2015, some of the alleged facts are not applicable to this case.

The complaint alleges that many of these MDEQ Defendants knew as early as May 2014 that Flint's water was contaminated in ways that could be life threatening. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5130–5131, 5140–5141.) Even if the MDEQ Defendants were not aware of *legionella* bacteria in particular by the time of Bertie Marble's death, the facts alleged plausibly show that Busch, Shekter Smith, and Prysby were aware of the dangerous condition of the City's water supply before she died.

As to the MDEQ Defendants' deliberate indifference to these known risks, in *Carthan*, the Court found that:

> [D]espite knowing of these serious risks, these defendants were indifferent to them. Shekter-Smith ensured that Flint received the ACO that allowed it to transition to the Flint River; Cook signed the final permit necessary for the FWTP to begin operations; and Busch resolved the regulatory hurdles associated with Flint's use of the Flint River. Furthermore, these defendants took steps to deceive Flint's residents into continuing to drink and bathe in the

contaminated water. Busch and Cook misled the EPA by falsely suggesting that the proper corrosion control was in use at the FWTP; and Busch . . . and Prysby directly or indirectly altered reports to remove results showing high lead concentrations in Flint's water. These actions exhibited a callous disregard for plaintiffs' right to bodily integrity.

384 F. Supp. 3d at 859 (footnote omitted). The *Walters* Master Complaint tracks the allegations in *Carthan*, but some of the alleged facts are not applicable to this case in light of the fact that Bertie Marble died in March 2015.

*Stephen Busch and Michael Prysby*

The Master Complaint plausibly alleges elements one and two of a bodily integrity claim: that Busch and Prysby were aware of and did infer that the FWTP was not ready to begin processing water and that as a result, Flint water users faced a substantial risk of harm. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5071–5072, 5079–5080, 5130–5131.) Plaintiffs allege that Busch was involved in resolving the regulatory hurdles to using Flint River water. (*Id.* at PageID.5173–5176.) For example, he helped obtain an Administrative Consent Order ("ACO") that was critical to allowing the City of Flint to begin using the FWTP, although the plant was "nowhere near ready to begin distributing water."

(*Id.* at PageID.5176.) Plaintiffs allege that Prysby reviewed and approved the permit "that was the last approval necessary for the use of the Flint Water Treatment Plant." (*Id.* at PageID.5081, 5179.)

Moreover, shortly before the switch, the FWTP's water quality supervisor wrote to Prysby and Busch that he had inadequate staff and resources to properly monitor the water. (*Id.* at PageID.5080.) As a result, he informed Prysby and Busch, "I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction." (*Id.*) But Prysby and Busch did not act on this warning. Later, on February 27, 2015, Busch misled the EPA, telling the agency that the City was using corrosion control, which he knew was false. (*Id.* at PageID.5092.)

These actions all show a callous disregard for Bertie Marble's right to bodily integrity. Therefore, element three is met. These Defendants knew there were significant and potentially life-threatening problems with Flint's water and they chose to do nothing. Accordingly, Plaintiffs state a bodily integrity claim against Busch and Prysby.

*Liane Shekter Smith*

Much the same as Busch and Prysby, the Master Complaint plausibly alleges elements one and two of a bodily integrity claim: Shekter Smith was aware of and did infer that the FWTP was not ready to begin processing water. (*Id.* at PageID.5071–5072.) She also knew of the substantial risks faced by exposure to Flint's municipal water. (*Id.*) Further, element three is met. The Master Complaint alleges that Shekter Smith "played an integral role in ensuring that the City of Flint" obtained the ACO that allowed Flint to transition to Flint River water. (*Id.* at PageID.5179.) These actions are enough to show callous disregard to Flint water users. As mentioned above, this ACO was critical to allowing the City of Flint to begin using the FWTP, which was "nowhere near ready to begin distributing water." (*Id.* at PageID.5176.) Accordingly, Plaintiffs state a bodily integrity claim against Shekter Smith.

*Patrick Cook*

The Master Complaint does not adequately allege that Cook knew about the substantial risk of harm to Plaintiffs—a necessary element for a bodily integrity claim. The Master Complaint alleges that Cook "signed a permit in 2014 that was the last approval necessary for the use of the

Flint Water Treatment Plant." (*Id.* at PageID.5081.) But it does not allege that Cook knew of the dangers to Flint water users before he signed this permit.

The Master Complaint also alleges that Cook misled the EPA regarding the necessity of using corrosion control in Flint after the switch by forwarding the EPA information he knew to be false. (*Id.* at PageID.5092.) However, the Complaint does not specify when Cook misled the EPA. Cook's earliest recorded communication with the EPA according to the Flint Water Advisory Task Force Report was sent in April of 2015. (ECF No. 155-2, PageID.3411.)[12] Because Bertie Marble died in March of 2015, Plaintiffs have not stated a bodily integrity claim against Cook.

### iii. City Defendants

Plaintiffs allege that Defendants Kurtz, Earley, Ambrose, Croft, Johnson, Wurfel, Wells, and Glasgow violated Bertie Marble's right to

---

[12] This Report was referenced in the Master Complaint and attached to the State Defendants' motion to dismiss. (ECF No. 155-2, PageID.3411.) "When a court is presented with a 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Coll. Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

bodily integrity. For the following reasons, Plaintiffs state a claim against Earley, Ambrose, Croft, Johnson, and Glasgow, but fail to state a claim against Kurtz, Wurfel, and Wells.

*Edward Kurtz*

Plaintiffs do not state a bodily integrity claim against Kurtz. In *Carthan*, this Court found that "[a]lthough Kurtz may have set in motion the chain of events that led to the transition to the Flint River, he resigned as Flint's Emergency Manager before the transition and therefore lacked control over the final decision." *Carthan*, 384 F. Supp. 3d at 861. The allegations in the present case track those pleaded in *Carthan*, and so there is no reason to diverge from this Court's decision in that case.

*Bradley Wurfel*

Plaintiffs do not state a bodily integrity claim against Wurfel. In *Walters*, the Court found that the plaintiffs had stated a claim against Wurfel. 2019 WL 3530874, at *36. But the case here is different because Bertie Marble died before Wurfel's deliberately indifferent actions. The Court in *Walters* found that Wurfel's deliberate indifference was demonstrated by several occasions where he "publicly denied that there

was a problem with Flint's water." *Id.* He "appeared on radio and television to advise listeners that the water was safe to consume and bathe in, and he discredited others who suggested that lead was leaching into Flint's water." *Id.*

But all of these public statements alleged in the complaint were made after Bertie Marble's death in March of 2015. In their response brief, Plaintiffs attempt to recast the allegations against Wurfel as being broader acts of "misleading the public," pointing to private emails he sent to government officials. (ECF No. 176, PageID.5055.) Specifically, Plaintiffs identify an email sent to the Governor's press secretary in January 2015 wherein Wurfel requested that no public statements be made about the safety of Flint's water until he received test results back indicating that the water was safe. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5090.) Although Wurfel would go on to make allegedly false statements after Marble's death, his email in January 2015 does not demonstrate callous disregard. The bodily integrity claim against Wurfel is dismissed.

*Eden Wells*

Plaintiffs have not stated a bodily integrity claim against Wells. The Sixth Circuit in *Guertin* reversed this Court in finding a bodily integrity claim against Wells, concluding that "[t]he complaint sets forth no facts connecting . . . Wells to the switch to the Flint River or the decision not to treat the water, and there is no allegation that [she] took any action causing plaintiffs to consume the lead-contaminated water." *Guertin*, 912 F.3d at 929–30. Plaintiffs' Master Complaint and Addendum similarly include no additional allegations against Wells that show she had any authority over the switch to the Flint River or took actions to deceive people into consuming the water. Further, the Plaintiffs argue in their response brief that the Court should "rely on its previous rulings and the Sixth Circuit's opinion in *Guertin*" because their "bodily integrity claim [relies] on many of the same underlying facts alleged" in prior Flint cases. (ECF No. 176, PageID.5072.) *Guertin* is binding on this Court and mandates holding that Plaintiffs do not state a claim against Wells.

*Darnell Earley and Gerald Ambrose*

Plaintiffs state a bodily integrity claim against Earley and Ambrose. Earley was Flint's Emergency Manager during the transition

to the Flint River as a water source. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5055.) Ambrose took over as Emergency Manager after Earley in January 2015. (*Id.* at PageID.5056.) As the Court explained in *Walters*, it is reasonable to infer, as Plaintiffs allege, that Earley and Ambrose were both aware of the substantial risk of harm plaintiffs faced:

> After Flint transitioned to the Flint River, [Earley and Ambrose] knew about the outbreak of Legionnaires' disease; General Motors stopped using Flint water at its Flint factory because of its corrosive nature; and test results revealed high lead levels in two locations on the University of Michigan-Flint's campus. There were even growing calls from senior government officials that Flint "should try to get back on the Detroit system as a stopgap ASAP before this thing gets too far out of control."

2019 WL 3530874, at *37 (quoting *Carthan*, 384 F. Supp. 3d at 860).

Additionally, Plaintiffs plead that Earley and Ambrose were indifferent to this risk. Even though Earley was aware of the dangers of using the FWTP, under his direction as Emergency Manager he ordered the transition to Flint River water in April of 2014. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5081.) ("Earley ordered and set in motion the use of highly corrosive and toxic Flint River water knowing that the WTP was not ready.") Earley also repeatedly refused to consider returning to DWSD water. (*Id.* at PageID.5087, 5133.) Having replaced

56

Earley as the Emergency Manager, Ambrose also refused to return to DWSD. (*Id.* at PageID.5089–5091.) In both cases, Earley and Ambrose's conduct thus showed a callous disregard for Bertie Marble's right to bodily integrity. Plaintiffs therefore state a bodily integrity claim against Earley and Ambrose.

*Howard Croft, Daughtery Johnson, and Michael Glasgow*

Plaintiffs plead a plausible bodily integrity claim against Defendants Croft, Johnson, and Glasgow. As explained in *Carthan*:

> [I]t is reasonable to conclude that these defendants were aware of the substantial risk of harm facing plaintiffs. As the transition to the Flint River loomed, all three knew that the FWTP was not ready to process the raw water. And Croft, in particular, was aware of the lead and Legionnaires' disease issues that followed the transition. Glasgow tested for and found high concentrations of lead in the water. He also recognized that Flint was not using corrosion control treatment and had no legitimate lead and copper testing in place. Moreover, these defendants acted with a callous disregard for plaintiffs' right to bodily integrity. Despite knowing that the FWTP was not ready to process the Flint River water, Croft and Johnson pressured Glasgow to give the green light to the transition. Johnson later blocked the Genesee County Health Department from scrutinizing Flint's water testing process. And Glasgow altered reports to hide high lead concentrations in Flint's water. Croft, Glasgow, and Johnson were thus deliberately indifferent by deceiving

> plaintiffs into thinking that there was no problem with Flint's water.

384 F. Supp. 3d at 860. In *Walters*, the Court found that the Master Complaint contained essentially the same allegations as *Carthan*'s complaint with respect to the plaintiffs' bodily integrity claims against Croft, Johnson, and Glasgow. *Walters*, 2019 WL 3530874, at *18. The Master Complaint was adopted in full here, but the Court must only consider factual allegations before Bertie Marble's death in March of 2015.

There is no question that these Defendants were aware of the substantial risk of harm before March 2015. Moreover, all three Defendants participated in making the switch to the Flint River in April 2014, knowing that the FWTP was not ready to process water. This fact alone is enough to show callous disregard for Bertie Marble's bodily integrity. But all of the additional instances demonstrating deliberate indifference cited by the Court in *Walters* took place before Marble's death in March of 2015. Accordingly, Plaintiffs have stated a bodily integrity claim against Croft, Johnson, and Glasgow.

iv.   **City of Flint *Monell* Liability**

Plaintiffs allege that the City of Flint is liable under 42 U.S.C. § 1983 as a result of the unconstitutional actions taken by Earley and Ambrose. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5051–5052, 5055–5056.) Under *Monell v. Department of Social Services of the City of New York*, a plaintiff can bring a § 1983 claim against a city for the unconstitutional conduct of its employees if the employees' conduct implemented a policy "officially adopted and promulgated by that body's officers." 436 U.S. 658, 690 (1978). However, a municipality "cannot be held liable *solely* because it employs a tortfeasor." *Id.* at 691. Liability will only attach where the policy or custom was the "moving force" behind the constitutional violation. *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007).

In *Carthan*, the Court held that Earley and Ambrose "were final decisionmakers for Flint with respect to the decision to provide residents with contaminated water." 384 F. Supp. 3d at 865 (citing *Carthan*, 329 F. Supp. 3d at 421–22). As such, "their actions represented official policy and Flint could be held liable for their conduct insofar as it violated plaintiffs' rights." *Id.* (citing *Carthan*, 329 F. Supp. 3d at 422).

As set forth above, Plaintiffs state a claim that Earley and Ambrose violated Bertie Marble's constitutional right to bodily integrity, and therefore Plaintiffs state a *Monell* claim against the City of Flint with respect to this right.[13] The City of Flint's motion to dismiss is therefore denied, and Plaintiffs' *Monell* claim may go forward.

## C.   Intentional Infliction of Emotional Distress

Plaintiffs bring an intentional infliction of emotional distress ("IIED") claim against all Defendants, (ECF No. 143-1, PageID.3262–3263) and Defendants move to dismiss. (ECF No. 149, PageID.3297–3299); (ECF No. 155, PageID.3383); (ECF No. 156, PageID. 3909–3913); (ECF No. 157-1, PageID.3957–3958); (ECF 158, PageID.4447); (ECF No. 159, PageID.4490–4496); (ECF No. 160, PageID.4589–4595); (ECF No. 161, PageID.4679–4683); (ECF No. 164, PageID.4984–4989.)

As a preliminary note, the complaint states that this claim is brought on behalf of "all Plaintiffs," which includes the Estate of Bertie Marble and Bertie Marble's family members. At oral argument, however, Plaintiffs clarified that they bring this claim only on behalf of Bertie

_____

[13] This is not because the City is liable for Earley's general conduct, s*ee Monell*, 436 U.S. at 691, but because his unconstitutional acts represented the implementation of City policy.

Marble's family members. Plaintiffs also acknowledge that this Court has already ruled that Government Defendants have statutory immunity on a similar claim in *Guertin*. (ECF No. 176, PageID.5105–5106); *Guertin v. Michigan*, No. 16-cv-12412, 2017 WL 2418007, at *27 (E.D. Mich. June 5, 2017) ("Accordingly, plaintiffs' Count[] . . . (intentional infliction of emotional distress) . . . [is] dismissed as to all remaining governmental defendants, based on state statutory immunity."). On the basis of its reasoning in *Guertin*, this Court grants all of the Government Defendants' motions to dismiss the IIED count. Therefore, the Court will only address the IIED claims brought against VNA, LAN, and McLaren.

*Legal Standard*

In Michigan, a plaintiff alleging IIED must prove four elements: (1) the defendant's "extreme and outrageous" conduct; (2) the defendant's intent or recklessness; (3) causation; and (4) the plaintiff's severe emotional distress. *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602 (1985). The first element, "extreme and outrageous" conduct, is a high bar to meet under Michigan law. Liability has been found only where the defendant's conduct has been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious and utterly intolerable in a civilized community." *Graham v. Ford*, 237 Mich. App. 670, 674 (1999) (citing *Doe v. Mills*, 212 Mich. App. 73, 91 (1995)). For purposes of IIED, "[i]t is not enough that the defendant has acted with an intent that is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." *Id.*

*Analysis*

Plaintiffs set forth two arguments to support their claim for IIED. First, they allege that Defendants conspired and acted together to contaminate Flint's water. (ECF No. 143-1, PageID.3263.) Second, they allege that the true cause of Bertie Marble's death, *legionella* bacteria from Flint's water, was intentionally concealed from her family. (ECF No. 143, PageID.3187.) As explained below, Plaintiffs do not allege facts sufficient to show that any Defendant's conduct was "extreme and outrageous" as those terms are understood by Michigan courts. Certainly when viewed as whole, Plaintiffs' allegation about the facts that resulted in the Flint Water Crisis could cause the average person to declare that something outrageous happened. But that is very different from how the

words "extreme and outrageous" are used as terms of art in the context of a claim for IIED. Because Plaintiffs do not satisfy the first element of IIED, this claim is dismissed against all Defendants.

### i. VNA and LAN

Plaintiffs allege no specific facts connecting the actions of VNA or LAN Defendants to Bertie Marble or her family. The complaint makes general claims about how all Defendants contaminated Flint's water and then conspired together to cover up a public health hazard (ECF No. 143-1, PageID.3263), but it does not point to any particularized actions taken by VNA or LAN to cause Plaintiffs' severe emotional distress. In their response brief, Plaintiffs identify the following conduct underlying their IIED claim against the VNA and LAN Defendants: they "materially contributed to the events that resulted in Flint's contaminated water system which caused Bertie Marble's death" and they conspired with other Defendants to hide the health hazard from the public. (ECF No. 176, PageID.5106–5108.)

This Court considered a similarly posed negligent infliction of emotional distress ("NIED") claim against VNA and LAN in *Carthan*. 384 F. Supp. 3d at 870–71. There, the Court found that "[o]n review of

plaintiff's complaint, this claim is a request for emotional distress damages arising from the negligence claims asserted against LAN and Veolia. Because the claim is presented as one for NIED, it is dismissed on the grounds that it fails to plead an NIED claim under Michigan law." *Id.* at 870.

Similarly, and based on the facts set forth in the complaint, these IIED allegations are essentially a restatement of Plaintiffs' professional negligence claim against VNA and LAN. And it is clear that Plaintiffs state a claim for professional negligence against these two companies. *See infra* Section V.D. In light of the applicable case law, an IIED claim cannot be maintained against VNA and LAN. Negligence is not enough to demonstrate the "extreme and outrageous" conduct that is needed to proceed with an IIED claim. *Merriweather v. Int'l Bus. Machines*, 712 F. Supp. 556, 565 (E.D. Mich. 1989) ("[M]ere negligence . . . does not constitute conduct which is outrageous in character, extreme in degree and goes beyond all bounds of decency such that it may be regarded as atrocious.") Because Plaintiffs have not alleged "extreme and outrageous" conduct by LAN and VNA Defendants, as those terms are used in this context, they cannot state a claim for IIED.

## ii. McLaren

Plaintiffs allege that McLaren "acting through its agents and employees, believed that the cause of Bertie Marble's death was pneumonia due to a *legionella* infection," but concealed it from her family so that they would not seek an autopsy, "which would have exposed the true cause of death." (ECF No. 143, PageID.3195.) As for the concealment, Plaintiffs allege that McLaren "affirmatively undertook to assure that steps were not taken" to "perform an autopsy" and preserve evidence of the cause of death. (ECF No. 143-1, PageID.3217–3218.) In their response brief, Plaintiffs clarify these allegations, explaining that "McLaren misled the Plaintiffs into believing that the causes of Ms. Bertie's death were cardiopulmonary arrest, septic shock, and pneumonia." (ECF No. 176, PageID.5098) (citing ECF No. 161-1, Marble Certificate of Death). Because Plaintiffs believed McLaren's representations, they "did not take steps to have an autopsy done." (ECF No. 176, PageID.5098.)

In order to survive a motion to dismiss, this Court would need to find it extreme and outrageous that McLaren misled Bertie Marble's family into thinking her cause of death was "cardiopulmonary arrest,

septic shock, and pneumonia" and not "pneumonia due to a *legionella* infection." In their response brief, Plaintiffs contend that dishonesty regarding a loved one's death can constitute outrageous conduct for purposes of an IIED claim. They cite to a Michigan case, *Barnes v. Double Seal Glass Co., Plant 1*, 129 Mich. App. 66 (1983), which involves tragic facts about an employer's coverup of the death of the plaintiffs' sixteen-year-old son. In *Barnes*, the plaintiffs' son was loading glass onto a cart at work when the glass slipped and crushed his skull, tearing major arteries. *Id*. at 69. The plaintiffs alleged that the defendants failed to render timely medical assistance to their severely injured son, and instead of calling an ambulance, they took him to the hospital in the back of a pickup truck. Defendants then withheld his name from hospital personnel, telling the hospital that they found him on the side of a road. *Id*. at 69–70. When the employees returned to the workplace, they cleaned the accident site to preclude an accurate police investigation. *Id*. at 70. The court in *Barnes* did not resolve the merits of the IIED claim; rather the court determined that the exclusivity provisions of the Wrongful Death and Worker's Disability Compensation Acts did not bar

an IIED claim. *Id.* at 77. In so holding, the court explained that these actions and omissions together could constitute an IIED claim. *Id.*

McLaren's alleged actions here are distinguishable from the defendant's actions in *Barnes*. The *Barnes* plaintiffs pleaded several egregious and specific acts taken by the defendants to cover up their son's cause of death. Here, Plaintiffs make general allegations that McLaren deceived them into believing Bertie Marble died of the causes listed on her death certificate (cardiopulmonary arrest, septic shock, and pneumonia) even though McLaren staff believed she died of pneumonia due to a *legionella* infection. Deceiving a patient's family into believing that the patient died of one form of pneumonia when she likely died from another form of pneumonia is not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Graham v. Ford*, 237 Mich. App. 670, 674 (1999) (citing *Doe v. Mills*, 212 Mich. App. 73, 91 (1995)).

Plaintiffs allegations do not describe "extreme and outrageous" conduct as defined by Michigan courts. The bar for showing such conduct is high, and the type of activity leading to liability for IIED is significantly

more extreme. *See, e.g.*, *Haverbush v. Powelson*, 217 Mich. App. 228, 234 (1996) (describing the defendant's "escalating series of acts over a two-year period" as "extreme and outrageous" when those acts involved placing an axe and hatchet on the plaintiff's vehicle as well as sending a barrage of letters to the plaintiff and his loved ones). McLaren's alleged conduct does not meet the standard for an IIED claim contemplated by Michigan courts. *See Graham v. Ford*, 237 Mich. App. 670, 674 (1999) ("It is not enough that the defendant has acted with an intent that is tortious or even criminal . . .").

Although the Court is sympathetic to the emotional pain and upheaval that Plaintiffs surely faced in losing their wife and mother, a cause of action for IIED is an inapt vehicle for recovery. Plaintiffs' IIED claim is also dismissed as to McLaren.

### D.    Professional and Ordinary Negligence

Plaintiffs bring ordinary negligence claims against Engineering Defendants VNA and LAN. (ECF No. 143-1, PageID.3256–PageID.3261.) In *Carthan* this Court dismissed substantially similar claims against the VNA and LAN Defendants. 384 F. Supp. 3d at 871 ("[N]egligence claims against LAN and Veolia may only be brought as professional negligence

claims [not as ordinary negligence claims]."). For the reasons set forth below, this claim is dismissed as to LAN and VNA Defendants.

Plaintiffs also allege that both LAN and VNA Defendants committed professional negligence. (ECF No. 143-1, PageID.3248–3256.) VNA and LAN only move to dismiss the professional negligence claims brought by Bertie Marble's family members, and not her estate. (ECF No. 156, PageID.3924.) In Plaintiffs' response brief, they clarify that this count was only intended to be asserted on behalf of the Estate of Bertie Marble. (ECF No. 176, Page.ID5099–PageID.5100.) Therefore, the Estate of Bertie Marble's professional negligence claims against LAN and VNA may go forward.

## E.  Right of Access to Courts

Plaintiffs bring a claim under 42 U.S.C. § 1983 for denial of access to courts against all Government Defendants and McLaren. (ECF No. 143-1, PageID.3240–3244.) Defendants ask this Court to dismiss the claim. (ECF No. 149, PageID.3290–3297); (ECF No. 155, PageID.3373–3378); (ECF No. 157-1, PageID.3959–3962); (ECF No. 158, PageID.4453–4458); (ECF No. 159, PageID.4482–4486); (ECF No. 160, PageID.4585–4588); (ECF No. 161, PageID.4667–4672.) Because Plaintiffs have not

shown that McLaren is a state actor—a necessary requirement to bring a claim under § 1983—this claim is dismissed against it. *See supra* Section IV.A. The Court will therefore only address this denial-of-access claim against the Government Defendants.

*Legal Standard*

The Supreme Court recognizes the "constitutional right of access to the courts, whereby a plaintiff with a nonfrivolous legal claim has the right to bring that claim to a court of law." *Flagg v. City of Detroit*, 715 F.3d 165, 173 (6th Cir. 2013) (citing *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002)). These claims may be "forward-looking" or "backward-looking." *Christopher*, 536 U.S. at 415. In forward-looking claims, the plaintiff accuses the government of creating or maintaining some "frustrating condition" standing between the plaintiff and "the courthouse door." *Id.* at 413. In backward-looking claims, such as in this case, "the government is accused of barring the courthouse door by concealing or destroying evidence so that the plaintiff is unable to ever obtain an adequate remedy on the underlying claim." *Flagg*, 715 F.3d at 173 (citing *Christopher*, 536 U.S. at 413–14).

To prevail on an access-to-courts claim Plaintiffs must show (1) the existence of a nonfrivolous underlying claim; (2) that state actors took obstructive actions; (3) that substantial prejudice to the underlying claim cannot be remedied by a court; and (4) a request for relief that the plaintiff would have sought on the underlying claim, which is now otherwise unattainable. *Flagg*, 715 F.3d at 174 (citing *Christopher*, 536 U.S. at 415, 421–22; *Swekel v. City of River Rouge*, 119 F.3d 1259, 1262–1264 (6th Cir. 1997)).

*Analysis*

Plaintiffs allege that the Government Defendants and McLaren conspired to conceal evidence that Flint's water was the source of *legionella*, leading to an outbreak of Legionnaires' disease. (ECF No. 143-1, PageID.3241.) In furtherance of this conspiracy, McLaren did not test Bertie Marble for Legionnaires' disease after her death. (*Id.* at PageID.3242.) Plaintiffs allege that Bertie Marble "likely died from exposure" to *legionella*, but that without an autopsy, a definitive cause of death could not be established. (*Id.*) The cover-up "destroyed evidence" for the estate of Bertie Marble's underlying negligence claim against

McLaren, which in turn rendered Plaintiffs' judicial remedies "inadequate or ineffective." (*Id.*)

Although Plaintiffs identify a nonfrivolous underlying negligence claim against McLaren,[14] they cannot meet the fourth element of a denial-of-access claim: a showing that their requested relief is otherwise unattainable. *Flagg*, 715 F.3d at 174. In their response brief, Plaintiffs "concede that it has not been determined yet if the relief sought is unattainable." (ECF No. 176, PageID.5098.) This admission alone is dispositive here and requires that the claim be dismissed.

Still, Plaintiffs ask the Court to consider their access-to-courts claim as an "alternative theory" to their negligence claim against McLaren. (*Id.* at PageID.5099.) Because of the allegedly destroyed evidence, Plaintiffs contend they "face an uphill battle in proving causation" for their negligence claim. (*Id.* at PageID.5099.) In the event they are prevented from pursuing their negligence claim against

---

[14] *See infra* Section V.F. Although their complaint does not specify any underlying claim (ECF No. 143-1, PageID.3240–3244), Plaintiffs' response brief clarifies they intended for "negligence" to be the underlying claim. (ECF No. 176, PageID.5097–5098.)

McLaren, Plaintiffs argue that their access-to-courts claim ought to prevail in the alternative.

This Court is not aware of any cases allowing for a denial of access-to-courts claim to be pleaded in the alternative to the claim a plaintiff asserts they cannot bring. The notion of allowing denial-of-access claims as an alternative theory runs contrary to the Sixth Circuit's requirement that plaintiffs must demonstrate that the relief they seek is unattainable. *Flagg*, 715 F.3d at 174. For example, in *Swekel v. City of River Rogue*, a plaintiff claimed that local police denied her access to the courts by covering up the identity of a driver who hit and killed her husband. 119 F.3d at 1260. The driver was the son of a high-ranking police officer whose identity was concealed by the police until after the statute of limitations had run. *Id.* at 1261. The Sixth Circuit affirmed dismissal of this claim, holding that the plaintiff bore the burden of showing that the defendants' actions "foreclosed her from filing suit in state court." *Id.* at 1264. Even though the plaintiff's allegations, if true, would have substantially prejudiced her from recovering in state court, it was dispositive that the plaintiff never "attempted to go to state court in first instance." *Id.* The court made clear that "[b]efore filing an 'access to

courts' claim, a plaintiff must make some attempt to gain access to the courts; otherwise, how is this court to assess whether such access was in fact 'effective' and 'meaningful'?" *Id.* The *Swekel* court noted that in some instances, it would be "completely futile" to bring a claim to state court, but that the plaintiff had not presented evidence to show futility. *Id.* at 1264, n.2. Similarly, there is no futility exception here because Plaintiffs are currently bringing a negligence claim in this lawsuit.

Plaintiffs cite to a 2003 case in the Southern District of Ohio where a plaintiff was allowed to proceed without first adjudicating the case in state court. *Kammeyer v. City of Sharonville*, No. C-1-01-649, 2003 WL 25774000, at *3 (S.D. Ohio Feb. 13, 2003). There, the court pointed to the futility exception noted by the Sixth Circuit in *Swekel* and explained that it took the *Kammeyer* plaintiffs nearly twenty years to discover the defendants' cover up. *Id.* at *4 (citing *Swekel*, 119 F.3d at 1264). However, this decades-long delay readily distinguishes the *Kammeyer* case from this case.

Plaintiffs are, in this very lawsuit, bringing a claim of negligence against McLaren and may still succeed on it, because as set forth below, their negligence claim survives McLaren's motion to dismiss. Even

though they might "face an uphill battle in proving causation" (ECF No. 176, PageID.5099), the Sixth Circuit is clear that "[a] plaintiff cannot merely guess that a state court remedy will be ineffective because of a defendant's actions.[15] Rather, the plaintiff must present evidence that the [defendant's] actions actually rendered any available state court remedy ineffective." *Swekel*, 119 F.3d at 1264. Because Plaintiffs cannot meet the requirements of an access-to-courts claim, it is dismissed as to all Defendants without prejudice.

## F.   Negligence against McLaren Regional Medical Center

Defendant McLaren moves to dismiss Plaintiffs' negligence claim because (1) it is a medical malpractice claim not properly before this

---

[15] The Court notes that Plaintiffs are asking this Court to find that they have been denied access to courts on their negligence claim, while at the same time asking it to deny McLaren's motion to dismiss the negligence claim. For purposes of this motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys,* 684 F.3d at 608. Plaintiffs are asking the Court to accept as true that the element of causation for their negligence claim is substantially compromised in a way that cannot be remedied by a court. At the same time, Plaintiffs are asking this Court to find that the causation element has been sufficiently alleged in order "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 547. The Court has endeavored to understand this contradiction, but has not succeeded.

Court, and (2) even if it were an ordinary negligence claim, Plaintiffs fail to properly allege it. (ECF No. 157-1, PageID.3963–3974.)

Plaintiffs concede that although their negligence claim was brought on behalf of "all Plaintiffs," only the Estate of Bertie Marble can properly bring the claim because decedent Bertie Marble was the only party who suffered physical injury. (ECF No. 176, PageID.5105.) The negligence claims of Bertie Marble's family members against McLaren are dismissed, but the negligence claim brought on behalf of Bertie Marble's estate may proceed.

### i. Medical Malpractice

McLaren argues that Plaintiffs' negligence claim should be dismissed because it is actually a claim for medical malpractice, and malpractice suits have certain statutory requirements that Plaintiffs have not met. *See* Mich. Comp. Laws § 600.2912. Plaintiffs contend that the main issue in this case is the hospital's failure to address a *legionella* outbreak in its facility, which does not involve complex medical issues. They argue that this case is no different from other *legionella*-related negligence cases against restaurants and hotels, where the central issue

has nothing to do with medical treatment and instead revolves around premises liability.

The Michigan Supreme Court set forth a two-part test for distinguishing medical malpractice from ordinary negligence. *See Bryant v. Oakpointe Villa Nursing Ctr.*, 471 Mich. 411, 420–22 (2004). First, courts ask whether the alleged conduct occurred "within the course of a professional relationship" and, second, whether the allegations "raise questions involving medical judgment." *Id*. If the answer to both questions is yes, the claim is properly brought as one for medical malpractice, and not as an ordinary negligence action.

There is no dispute between the parties as to the first question because Bertie Marble's claim arose while she was a patient at McLaren Regional Medical Center, and so there is presumptively a professional relationship between them. (ECF No. 157-1, PageID.3967.) The issue here is whether the second *Bryant* factor is met. To assess whether a party's allegations raise questions involving medical judgment, courts ask whether "the reasonableness of the health care professionals' action can be evaluated by lay jurors, on the basis of their common knowledge and experience." 471 Mich. at 423. If jurors do not need expert testimony

to determine whether conduct is unreasonable, the case is one of ordinary negligence. *Id.*

For example, *Bryant* concerned claims arising from the death of a nursing home resident who was asphyxiated after being wedged between her mattress and bed rails. *Id.* at 415–17. Staff had observed the patient slipping out of bed the previous day and nearly asphyxiating herself, and they failed to take action to prevent the same thing from happening again. *Id.* The *Bryant* plaintiff was permitted to proceed with an ordinary negligence claim because the court found that "[n]o expert testimony [was] necessary to show that the defendant acted negligently by failing to take any corrective action after learning of the problem." *Id.* at 431. In *Bryant*, a fact-finder could rely on common knowledge and experience alone and still readily determine whether the defendant's response was sufficient. *Id.*

Defendant McLaren argues that the claim here depends on allegations that the hospital failed to inform patients about an infectious disease and then failed to conduct testing to determine the cause of Bertie Marble's death. (ECF No. 157-1, PageID.3965–3966.) But Plaintiffs do not include allegations about a failure to conduct diagnostic testing under

this count. (ECF No. 143-1, PageID.3261–3262.) At base, Plaintiffs' negligence allegations are about premises liability: McLaren invited patients onto its property, did not warn these patients that they could be exposed to *legionella* at the medical center, and failed to take steps to address this safety issue.

McLaren claims that any and all legal duties arose within the context of Bertie Marble's status as a patient and McLaren's status as a healthcare facility. (ECF No. 157-1, PageID.3967–3968.) But accepting this argument would turn most healthcare facility premises liability claims into medical malpractice suits. Surely a patient need not bring a medical malpractice suit for a slip and fall in the hospital's hallways. McLaren argues that a "jury would be unable to determine whether the hospital failed to take appropriate action with respect to Bertie Marble's treatment," (*Id.* at PageID.3968), but a jury need not consider questions about medical treatment in this case. As in *Bryant*, where a jury could determine that a healthcare facility failed to take appropriate steps to prevent a patient from asphyxiating herself, the jury in this case would not need a medical background to understand that a hospital has a duty

to warn incoming patients and visitors of a lethal bacteria spreading within its halls. *See* 471 Mich. at 423–24.

In its motion to dismiss, McLaren identifies a number of questions that it contends would be out of a jury's common knowledge and experience. For example, a juror would not be able to determine "whether physicians adequately assessed the risk that a patient may be exposed to *legionella* that may be present in the hospital's water supply and contract an infection." (ECF No. 157-1, PageID.3968–3969.) But once McLaren identified that there was a *legionella* outbreak in its hospital, there is no need to determine which patients are more at risk than others—presumably all are at risk. McLaren also contends a jury would need to determine "whether physicians implemented adequate preventative or corrective measures to mitigate any risk of patient exposure and infection." (*Id.* at PageID.3969.) However, Plaintiffs allege that McLaren took no actions, and even attempted to cover up a *legionella* outbreak in its system. Taking "all allegations as true," *Keys,* 684 F.3d at 608, a juror would not need expert medical testimony to determine that inaction during an outbreak constitutes negligence. The Court finds that the issues raised by Plaintiffs here are not of the type that would require a

juror to hear expert medical testimony. Accordingly, the claim is one of ordinary negligence, not medical malpractice.

## ii.  Ordinary Negligence

McLaren argues that even if Plaintiffs' claim is construed as one of ordinary negligence, it should be dismissed because Plaintiffs failed to properly allege that McLaren owed a duty of care to Plaintiffs as required under Michigan law. (ECF No. 157-1, PageID.3973.) McLaren also argues that the claim should be dismissed because Plaintiffs' allegations are merely conclusory and do not meet the federal pleading standards.

Plaintiffs bring what is essentially a premises liability claim. (ECF No. 143-1, PageID.3261–3262.) They do not label the claim as such in their complaint, but they argue it as a premises liability claim in their response brief. (ECF No. 176, PageID.5100.) Because decedent Bertie Marble's injury arose from an allegedly dangerous condition in a healthcare facility, the action "sounds in premises liability rather than ordinary negligence; this is true even when the plaintiff alleges that the premises possessor created the condition giving rise to the plaintiff's injury." *Buhalis v. Trinity Continuing Care Servs.*, 296 Mich. App. 685, 692 (2012). "It is well settled that the gravamen of an action is

determined by reading the complaint as a whole, and by looking beyond mere procedural labels to determine the exact nature of the claim." *Adams v. Adams*, 276 Mich. App. 704, 710–11 (2007). A claim based on the condition of the premises is a premises liability claim. *James v. Alberts*, 464 Mich. 12, 18–19 (2001).

To prevail on a premises liability negligence action under Michigan law, Plaintiffs must prove the following elements: (1) the Defendant owed Plaintiffs a duty; (2) the Defendant breached that duty; (3) an injury proximately resulted from that breach; and (4) Plaintiffs suffered damages. *Benton v. Dart Props.*, 270 Mich. App. 437, 440 (2006) (citing *Taylor v. Laban*, 241 Mich. App. 449, 452 (2000)). "[T]he existence of a legal duty is a question of law for the court to decide." *Anderson v. Wiegand*, 223 Mich. App. 549, 554 (1997). "Unless the defendant owed a duty to the plaintiff, the negligence analysis cannot proceed further." *Bell & Hudson, PC v. Buhl Realty Co.*, 185 Mich. App. 714, 717 (1990). Defendant McLaren argues that the element of duty is not met here. (ECF No. 157-1, PageID.3973.)

### a. Duty of Care

Plaintiffs allege that McLaren "had a duty to provide safe water to its patients." (ECF No. 143-1, PageID.3262.) They contend that by January 2015, McLaren knew of the connection between *legionella* and the use of Flint water and so it had the "duty to take corrective action" and inform patients of the risk of contracting Legionnaire's disease. (*Id.*) McLaren argues that these allegations are not sufficient to establish a duty of care. (ECF No. 157-1, PageID.3973.) Specifically, McLaren argues that there is no common law or statutory basis for the alleged duty to provide patients with safe water and to "warn patients each and every time any amount of bacteria was detected." (*Id.*)

It is undisputed that Bertie Marble was present at the hospital for business purposes and, therefore, was an invitee. "[A]n invitee is entitled to the highest level of protection under premises liability law." *Stitt v. Holland Abundant Life Fellowship*, 462 Mich. 591, 597 (2000). As a landowner, McLaren has a duty to not only warn invitees of known dangers, but also to "make the premises safe, which requires the landowner to inspect the premises and, depending upon the circumstances, make any necessary repairs or warn of any discovered hazards." *Id.* Although a "possessor of land is not an absolute insurer of

the safety of an invitee," *Anderson v. Wiegand,* 223 Mich. App. 549, 554 (1997), generally, an owner of land "owes a duty to an invitee to exercise reasonable care to protect the invitee from an unreasonable risk of harm caused by a dangerous condition on the land." *Lugo v. Ameritech Corp.*, 464 Mich. 512, 516 (2001).

Defendant McLaren argues that there is no statutory duty to report bacteria outbreaks under Michigan's Public Health and Administrative Rules. (ECF No. 157-1, PageID.3973–3974.) However, there is a common law duty of care that applies under these alleged facts. McLaren owed a duty to Bertie Marble to "exercise reasonable care" to protect her from dangerous conditions. *Lugo*, 464 Mich. at 516. McLaren also had a duty to make the premises safe if, as Plaintiffs allege, McLaren "was aware that there was a significant increase in the number of fatal and non-fatal cases of Legionnaires' Disease" that coincided with the introduction of Flint River water as the drinking source for Flint residents. (ECF No. 143-1, PageID.3216–3217.) Plaintiffs further allege that McLaren "had sufficient knowledge of the risks associated with exposure" to the *legionella* bacteria stemming from the use of Flint water, but "deliberately concealed" the risk of injury from its patients. (*Id.* at

PageID.3217.) The Court need not decide how bacteria-free a hospital must be, but accepting these allegations as true, McLaren's conduct constituted a failure of a duty to either "make any necessary repairs or warn of any discovered hazards." *Stitt*, 462 Mich. at 597. Any landowner has a duty to warn of known dangers and take care in mitigating risks of injury. McLaren may not have a specific duty to "provide safe water," but they certainly had a duty *not* to provide water they knew or suspected was unsafe.

### b. Causation

Defendant McLaren does not directly argue that the element of causation is not met, but instead contends that no allegations about Bertie Marble's illness and cause of death rise "above the speculative level" to satisfy the pleading standard. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). McLaren argues that Plaintiffs' allegations amount to no more than a suspicion that Bertie Marble died of *legionella*.

Plaintiffs admit that whether *legionella* was the cause of Bertie Marble's death was never established. (ECF No. 143-1, PageID.3217–3218, 3244.) But Plaintiffs do affirmatively allege that Bertie Marble died of *legionella* while a patient at McLaren. (ECF No. 143-1, PageID.3202.)

("Bertie Marble died as a result of exposure to the *legionella* bacteria.") As Plaintiffs acknowledge, they have an "uphill battle" in proving causation (ECF No. 176, PageID.5099), but whether or not they can is a question for the jury.

Although the Plaintiffs' Addendum to the Short Form Complaint is difficult to decipher, when viewed in the light most favorable to the Plaintiffs, their allegations rise above the speculative level. Both parties agree that Bertie Marble died of pneumonia, and Legionnaires' disease is a type of pneumonia. Plaintiffs also allege sufficient detail about the connection between the *legionella* outbreak at McLaren and Bertie Marble's death. With more evidence or expert testimony, a jury could find that Bertie Marble likely died from exposure to *legionella* at McLaren. Plaintiffs' allegations are sufficient to satisfy the liberal pleading standard of Rule 8(a) of the Federal Rules of Civil Procedure.

### c. Breach and Damages

In its motion to dismiss, McLaren does not offer an argument as to why Plaintiffs have not properly alleged the elements of breach or damages. Plaintiffs alleged that McLaren had a "duty to take corrective action and so inform" patients of the *legionella* bacteria and failed to do

so, which constitutes a breach. (ECF No. 143-1, PageID.3262.) Plaintiffs also allege that Bertie Marble sustained injuries and damages as a result of this breach of duty. (*Id.*) Therefore, Plaintiffs adequately allege the remaining two elements of premises liability.

### d. Conclusion

The Estate of Bertie Marble states a plausible claim of negligence against McLaren, and so McLaren's motion to dismiss this claim is denied.

### G. Damages

Plaintiffs request punitive damages against all Defendants, (ECF No. 143, PageID.3189), (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5234), and Defendants move to dismiss. (ECF No. 149, PageID.3276); (ECF No. 155, PageID.3322); (ECF No. 156, PageID.3925–3926); (ECF No. 159, PageID.4476–4477); (ECF No. 160, PageID.4595–4596); (ECF No. 161, PageID.4683–4684.)

In this opinion and order, the Court is dismissing all but three types of claims. First, Plaintiffs successfully plead a claim under 42 U.S.C. § 1983 that certain Government Defendants violated Bertie Marble's right to bodily integrity; second, that LAN and VNA were professionally

negligent under state law; and third, that McLaren was negligent under state law. Plaintiffs acknowledge punitive damages are not available to them for their negligence claims. (ECF No. 176, PageID.5110.) The Court therefore grants VNA's, LAN's, and McLaren's motions to dismiss this claim for punitive damages.

But punitive damages may be awarded in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *King v. Zamiara*, 788 F.3d 207, 216 (6th Cir. 2015) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Plaintiffs plausibly plead recklessness and indifference to the right to bodily integrity. As a result, Plaintiffs may continue to seek punitive damages with respect to their remaining § 1983 bodily integrity claims.

Plaintiffs also allege that the named Defendants are "jointly and severally" liable. (ECF No. 73, PageID.332.) However, Michigan has replaced joint and several liability with fair share liability. *See Smiley v. Corrigan*, 248 Mich. App. 51, 55 (2001). As a result, any claim for joint and several liability is dismissed.

## VI. All Other Counts

On the Short Form Complaint and in their Addendum, Plaintiffs allege several other claims that this Court previously dismissed in *Walters*, 2019 WL 3530874. Plaintiffs concede that their claims for equal protection, ELCRA, § 1985 conspiracy, and gross negligence are based on "similar factual allegations" as claims that this Court has already dismissed. (ECF No. 176, PageID.5040.) On the basis of this Court's prior decision in *Walters*, these claims are dismissed.

## VII. Conclusion

Defendants' motions to dismiss Plaintiffs' Short Form Complaint are granted in part and denied in part. More specifically, Defendants' motions to dismiss: the state-created danger count are granted; the bodily integrity count are granted with respect to Dillon, Kurtz, Wurfel, Wells, and Cook, but denied with respect to Snyder, Busch, Prysby, Shekter Smith, Earley, Ambrose, Croft, Glasgow, Johnson, and the City of Flint (*Monell*); the equal protection counts are granted; the § 1985 conspiracy count are granted; the ELCRA count are granted; the gross negligence counts are granted; the punitive damages counts are granted with respect to Plaintiffs' professional negligence claims, but denied with

respect to Plaintiffs' § 1983 claims; and the access to courts claim are granted.

In addition, Plaintiffs' professional negligence and negligence counts can go forward, but the request for exemplary damages is dismissed along with any claim for joint and several liability.

## VIII. Order

IT IS ORDERED THAT,

Jeff Wright's motion to dismiss (ECF No. 149) is **GRANTED**; the State Defendants' motion to dismiss (ECF No. 155) is **GRANTED** in part and **DENIED** in part; VNA's motion to dismiss (ECF No. 156) is **GRANTED**; McLaren's motion to dismiss (ECF No. 157) is **GRANTED** in part and **DENIED** in part; the City Defendants' motion to dismiss (ECF No. 158) is **GRANTED** in part and **DENIED** in part; Bradley Wurfel's motion to dismiss (ECF No. 159) is **GRANTED**; Daniel Wyant's motion to dismiss (ECF No. 160) is **GRANTED**; the MDEQ Defendants' motion to dismiss (ECF No. 161) is **GRANTED** in part and **DENIED** in part; and LAN's motion to dismiss (ECF No. 163) is **GRANTED** in part and **DENIED** in part, and its motion to dismiss (ECF No. 164) is **GRANTED**.

As a result, Plaintiffs' bodily integrity claims against Defendants Snyder, Busch, Prysby, Shekter Smith, Earley, Ambrose, Croft, Glasgow, Johnson, and the City of Flint (*Monell*) will proceed; their professional negligence claims against LAN and VNA will proceed; their negligence claim against McLaren will proceed; and Plaintiffs may continue to request punitive damages with respect to their remaining § 1983 claim. However, in all other respects, Plaintiffs' claims are dismissed.

IT IS SO ORDERED.

Dated: April 10, 2020      s/Judith E. Levy
Ann Arbor, Michigan        JUDITH E. LEVY
                           United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 10, 2020.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager